UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/11/05

TRUST FOR THE CERTIFICATE : 
HOLDERS OF THE MERRILL : 
LYNCH MORTGAGE PASS- : 
THROUGH CERTIFICATES SERIES : 
1999-C1, by and through ORIX Capital : 
Markets, LLC, as Master Servicer and : 
Special Servicer, : 

            Plaintiff, : 

     - against - : 

LOVE FUNDING CORPORATION, : 

           Defendant. : 
----------------------------------------------------X

**OPINION AND ORDER**

**04 Civ. 9890 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

The Trust for the Certificateholders of the Merrill Lynch Mortgage

Investors, Inc. Mortgage Pass-Through Certificates Series 1999-C1 (the "Trust")

is suing Love Funding Corporation ("Love Funding") for breach of contract.[1] The

claim arises from Love Funding's alleged breach of one of the representations and

warranties in a Mortgage Loan and Purchase Agreement (the "MLPA") between

---

[1] The Trust originally brought suit in the Supreme Court of the State of New York, and Love Funding subsequently removed to federal court on the basis of diversity jurisdiction.

Love Funding and Paine Webber Real Estate Securities, Inc. ("PWRES"), whose successor, UBS Paine Webber ("UBS"),[2] subsequently assigned its rights under the MLPA to the Trust.[3]

Love Funding now moves for: (1) leave to amend its answer pursuant to Federal Rule of Civil Procedure 15 and (2) summary judgment concerning the categories of damages available to the Trust under the definition of the term "Repurchase Price" in the MLPA. In addition, the Trust moves — and Love Funding cross-moves — for summary judgment on Love Funding's alleged breach of the MLPA.

## II.    BACKGROUND

### A.    The Parties

The Trust is a New York trust created pursuant to a Pooling and Servicing Agreement, dated November 1, 1999, between Merrill Lynch Mortgage Investors, Inc. ("MLMI"), ORIX Capital Markets LLC ("ORIX"), and Norwest Bank Minnesota, N.A.[4] The holders of the certificates issued by the Trust are

---

[2]    To ease understanding, I shall refer to UBS as PWRES.

[3]    New York law governs the interpretation of the MLPA and determines the parties' rights and obligations thereunder. *See* MLPA § 9.05.

[4]    *See* Complaint ¶ 2.

referred to as Certificateholders.[5]  These certificates are essentially bonds secured by a pool of commercial mortgages that the Trust has purchased from lenders.[6] Such certificates are referred to as a "commercial mortgage-backed securities."[7]

Love Funding is a Virginia corporation with an office located in New York City.[8]  Love Funding "offers origination, consulting and servicing of multi-family and commercial loans for investors, and loan placement services for borrowers."[9]

**B.    Facts**

**1.    The MLPA**

In early 1999, Love Funding entered into a "correspondent arrangement" with PWRES, whereby Love Funding would find prospective loans for PWRES to underwrite.[10]  Love Funding was the lender in these transactions,

---

[5]     *See id.*

[6]     *See* Expert Memorandum of Teresa F. Esquivel ("Esquivel Op."), Ex. B to Declaration of Alec W. Farr, Counsel to Love Funding ("Farr Decl."), at 1.

[7]     *See id.*

[8]     *See* Answer ¶ 3.

[9]     Love Funding, *Company Profile, at* http://www.lovefunding.com/about/profile.shtml, Ex. A to Affidavit of Kenneth S. Yudell, Counsel to the Trust.

[10]     *See* Defendant's Rule 56.1 Statement in Support of Cross-Motion for Summary Judgment, dated August 29, 2005 ("Def. 56.1") ¶ 4.

but PWRES actually funded the loans, which were assigned to PWRES.[11] Love Funding and PWRES memorialized the terms of this arrangement in the MLPA, which is dated April 23, 1999.[12] PWRES drafted the MLPA.[13]

In the MLPA, Love Funding made a number of representations and warranties to PWRES concerning each of the loans it was assigning to PWRES.[14] For example, in section 5.02(cc) of the MLPA, Love Funding represented and warranted that at the time a particular loan is assigned: "There is no default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note."[15]

Section 5.03 of the MLPA defines PWRES's remedies in the event that Love Funding breaches one of the representations and warranties in section 5.02.[16] Section 5.03(a) provides, in relevant part: "[u]pon discovery by either [Love Funding] or [PWRES] of a breach of any of the foregoing representations

---

[11]    *See id.*

[12]    *See id.* ¶ 7.

[13]    *See id.*

[14]    *See* Plaintiff's Rule 56.1 Statement, dated August 10, 2005 ("Pl. 56.1") ¶ 12; Def. 56.1 ¶ 9.

[15]    *See* Def. 56.1 ¶ 10; MLPA § 5.02(cc).

[16]    *See* Def. 56.1 ¶ 24.

-4-

and warranties which materially and adversely affects the value of any or all of the Mortgage Loans . . . [(] a 'Breach') the party discovering such Breach shall give prompt written notice to the other.[17] In addition, section 5.03(b) provides, in relevant part: "[w]ithin sixty (60) days of the earlier of either discovery by or notice to [Love Funding] of any Breach of a representation or warranty, [Love Funding] shall cure such Breach in all material respects and, if such breach cannot be cured, [Love Funding] shall, at [PWRES's] option, repurchase such Mortgage Loan at the Repurchase Price."[18]

---

[17]     MLPA § 5.03(a).  The MLPA provides that a "Mortgage Loan" is:

> each mortgage loan considered for origination by [Love Funding] and purchased by [PWRES] subject to this Agreement . . . and includes without limitation the Mortgage File, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, and all other rights, benefits, proceeds, and obligations arising from or in connection with such Mortgage Loan, excluding replaced or repurchased mortgage loans.

*Id.* § 1.01.

[18]     MLPA § 5.03(b).  The MLPA defines "Repurchase Price" as follows:

> With respect to any Mortgage Loan, a price equal to (i) the Stated Principal Balance of the Mortgage Loan, plus (ii) interest on such Stated Principal Balance at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to [PWRES] to the date of

## 2.    The Arlington Loan

In 1998, principals of Cyrus II Partnership ("Cyrus") approached Love Funding for a loan to finance a rehabilitation project on the Arlington Apartments (the "Property") in Harvey, Louisiana.[19] Love Funding subsequently collected documents and information, performed lease audits, and made site visits to the Property.[20] Love Funding provided this information to PWRES, which conducted its own due diligence and ultimately committed to fund a loan to Cyrus.[21]

On July 6, 1999, Love Funding made a $6.4 million loan (the

---

> repurchase, minus (iii) amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in an account maintained by [Love Funding] for the benefit of [PWRES] for distribution in the month of repurchase.

*Id.* § 1.01.  The MLPA defines "Stated Principal Balance" as follows:  "As to each Mortgage Loan, (i) the principal balance of the Mortgage Loan on the related Funding Date, minus (ii) all amounts distributed to [PWRES] pursuant to the terms of this Agreement with respect to the related Mortgage Loan representing payments or recoveries of principal."  *Id.*  The MLPA defines "Mortgage Interest Rate" as "[t]he annual rate of interest borne on a Mortgage Note which shall be adjusted from time to time, with respect to Adjustable Rate Mortgage Loans, in accordance with the provisions of the Mortgage Note."  *Id.*

[19]    *See* Def. 56.1 ¶ 42.

[20]    *See id.* ¶¶ 43, 45.

[21]    *See id.* ¶ 44.

"Arlington Loan"), to Cyrus.[22]  The Arlington Loan was memorialized by a

Mortgage Note, which in turn was secured by a Mortgage, Security Agreement

and Assignment of Leases and Rents (the "Mortgage") that provided for a lien on

the Property.[23]  Love Funding immediately sold the Arlington Loan to PWRES

pursuant to the MLPA.[24]

### 3.      The Trust's Discovery of Cyrus's Fraud

On or about November 1, 1999, PWRES sold the Arlington Loan, as

well as many other loans, to the Trust as part of a commercial mortgage-backed

securities transaction, pursuant to an agreement between PWRES and MLMI.[25]

This agreement included representations and warranties by PWRES concerning

the loans sold to the Trust, including the Arlington Loan.[26]  The agreement also

contained a provision requiring PWRES to cure any breaches of its representations

and warranties or, if such breaches could not be cured, to repurchase the offending

---

[22]      *See* Pl. 56.1 ¶¶ 1-2; Def. 56.1 ¶¶ 53-54.

[23]      *See* Pl. 56.1 ¶ 3; Def. 56.1 ¶ 55.

[24]      *See* Pl. 56.1 ¶ 5; Def. 56.1 ¶ 56.

[25]      *See* Pl. 56.1 ¶ 6; Def. 56.1 ¶ 57; Mortgage Loan Purchase Agreement,
dated November 1, 1999, Ex. F. to Farr Decl., at 1.

[26]      *See* Def. 56.1 ¶ 59.

loans.[27]

On March 8, 2002, the Trust declared the Arlington Loan to be in default.[28] Soon thereafter, the Trust discovered that Cyrus had committed fraud in obtaining the Arlington Loan.[29] This fraud consisted of the submission of fake leases and a false rent roll, borrower certificate, loan application and financial statement to Love Funding.[30] At the time that Love Funding was conducting its due diligence concerning Cyrus and the Property, it was unaware that the documents and information submitted by Cyrus were false.[31]

The Mortgage provided that the submission of false or misleading

---

[27]    See id. ¶ 60.

[28]    See id. ¶ 63. On March 13, 2002, the Trust's servicer, ORIX, instituted foreclosure proceedings against Cyrus in Louisiana. See id. ¶ 70. On October 21, 2004, the Property was sold for $6.7 million pursuant to a consent judgment. See id. ¶ 71.

[29]    See Pl. 56.1 ¶ 19; Def. 56.1 ¶ 65.

[30]    See Pl. 56.1 ¶¶ 20-24.

[31]    See Def. 56.1 ¶ 48. Although the Trust does not dispute this statement, it does claim that it is irrelevant. See Plaintiff's Response to Defendant's Statement of Undisputed Material Facts in Support of Love Funding's Cross-Motion for Summary Judgment ¶ 48. As explained below, Love Funding's knowledge of Cyrus's fraud is relevant only if the MLPA is ambiguous, as Love Funding urges. See infra Part IV.C.1.

documents by Cyrus would result in the acceleration of the Arlington Loan.[32]

Specifically, section 20 of the Mortgage states:

> The Debt shall become immediately due and payable at the option of [Love Funding], without notice or demand, upon any one or more of the followsings [sic] events ("Events of Default"): . . .
> (e) if any representation or warranty of [Cyrus], or any person guaranteeing payment of the Debt or any portion thereof or performance by [Cyrus] of any of the terms of this Mortgage . . . , made herein or in an [sic] such guaranty, or in any certificate, report, financial statement or other instrument or document furnished to [Love Funding] shall have been false or misleading in any material respect when made.[33]

In 2004, a Louisiana state court determined that Cyrus's fraud in obtaining the Arlington Loan constituted an "Event of Default" under the Mortgage.[34] The court based its determination in part on the testimony of several former employees of Cyrus concerning the falsification of documents that were provided to Love Funding.[35]

### 4.    The Trust Sues PWRES

---

[32]    *See* Mortgage § 20.

[33]    *Id.*

[34]    *See Cyrus II P'ship v. ORIC Capital Mkts., LLC*, No. 578-417, slip op. at 13 (Jefferson Parish Ct. Dec. 23, 2004), Ex. C to Affidavit of Paul Simon, Counsel to the Trust.

[35]    *See id.* at 14-16.

In October 2002, the Trust sued PWRES in the United States District Court for the Northern District of Texas, alleging fraud and other infirmities in regard to numerous loans, including the Arlington Loan.[36] The Trust also sued PWRES in Texas state court for breach of contract, for PWRES's alleged failure to cure or repurchase multiple loans, including the Arlington Loan.[37] Despite this, PWRES did not send Love Funding written notice that it believed that Cyrus's fraud constituted a breach of Love Funding's warranties and representations in the MLPA.[38] The Trust and PWRES settled their litigation in September 2004.[39] Pursuant to the settlement agreement, PWRES assigned its rights under the MLPA with regard to the Arlington Loan to the Trust.[40] The assignment is dated November 18, 2004.[41]

---

[36]     *See* Def. 56.1 ¶ 72.

[37]     *See id.* ¶ 73.

[38]     *See id.* ¶ 76.  In or around June 2002, Love Funding received subpoenas for documents from the Trust, PWRES, and Cyrus concerning the Arlington Loan. *See id.* ¶ 83  In addition, various former employees of Love Funding were deposed concerning the Arlington Loan in October 2002 and again in 2003. *See id.* ¶ 84.

[39]     *See id.* ¶ 88.

[40]     *See id.* ¶ 89.

[41]     *See id.* ¶ 90.

## III. LEGAL STANDARDS

### A. Leave to Amend

Leave to amend a pleading "shall be freely given when justice so requires."[42] However, if it appears that the movant has acted with undue delay, bad faith or dilatory motive, or allowing the amendment would cause undue prejudice to the opposing party, or amendment would be futile, then denial of a motion to amend lies within the sound discretion of the trial court.[43]

### B. Summary Judgment

Summary judgment is appropriate if the evidence of record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[44] "An issue of fact is genuine 'if the

---

[42] Fed. R. Civ. P. 15(a).

[43] *See Foman v. Davis*, 371 U.S. 178, 182 (1962). *See also Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) ("[A] Rule 15(a) motion should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.") (quotation marks omitted).

[44] Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, a court may rely only on admissible evidence. *See Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004).

evidence is such that a jury could return a verdict for the nonmoving party.'"[45] "A fact is material for these purposes if it 'might affect the outcome of the suit under the governing law.'"[46]

The movant bears the burden of demonstrating that no genuine issue of material fact exists.[47] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts,"[48] and it must "come forward with 'specific facts showing that there is a genuine issue for trial.'"[49] In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the

_____

[45]     *Overton v. New York State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[46]     *Id.* (quoting *Anderson*, 477 U.S. at 248).

[47]     *See Powell v. Nat'l Bd. of Medical Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004).

[48]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[49]     *Powell*, 364 F.3d at 84 (quoting *Aslanidis v. United States Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)).

non-moving party and draw all inferences in that party's favor.[50]

## IV.  DISCUSSION

### A.    Love Funding's Motion to Amend Its Answer

Love Funding seeks leave to amend its answer in order to:  (1) make it conform with facts learned in discovery, including the fact that the MLPA was assigned to the Trust on November 18, 2004; and (2) assert the affirmative defense of champerty.  The Trust opposes only the addition of the champerty defense, on the grounds that the amendment is futile.

Under New York law, "no corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, *with the intent and for the purpose of bringing an action or proceeding thereon.*"[51]  Interpreting the champerty statute's "intent and purpose" requirement, the New York Court of Appeals has held that:

> in order to constitute champertous conduct in the acquisition of rights . . . the foundational intent to sue on

---

[50]      *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).

[51]      *See* N.Y. Jud. L. § 489(1) (emphasis added).

-13-

that claim must at least have been the primary purpose, if not the sole motivation behind, entering into the transaction. . . . The bottom line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding.[52]

Moreover, "the question of the intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts."[53]

The Trust argues that Love Funding's champerty defense is futile because the undisputed facts make clear that litigation was not the Trust's primary purpose in acquiring PWRES's rights under the MLPA. Rather, the Trust asserts that it simply wanted Love Funding to stand by its obligations under the MLPA and cure the breach or repurchase the Arlington Loan.[54]

The Trust's contention that it is entitled to judgment regarding the champerty defense as a matter of law appears to be premature, because Love

---

[52]    *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 94 N.Y.2d 726, 736 (2000). *Accord Elliott Assocs., L.P. v. Banco de La Nacion*, 194 F.3d 363, 381 (2d Cir. 1999) (holding that New York's champerty statute is not violated when "the accused party's 'primary goal' is found to be the satisfaction of a valid debt and its intent is only to sue absent full performance.").

[53]    *Bluebird*, 94 N.Y.2d at 738.

[54]    *See* Memorandum of Law in Opposition to Motion by Love Funding for Leave to Amend Its Answer at 6; Affidavit of Douglas M. Goldrick in Opposition of the Motion of Love Funding for Leave to Amend the Answer ¶ 18.

Funding has not yet had an opportunity to conduct discovery on this issue.[55] It

would be unfair to require Love Funding to come forward with facts justifying the

defense at this time. Rather, under these circumstances, the adequacy of the

defense should be determined under "'a standard analogous to the standard of

review applicable to a motion brought under Rule 12(b)(6).'"[56] Because on the

face of the pleadings, the champerty defense is not "so frivolous or outlandish [as]

to render it futile," Love Funding's motion for leave to amend its answer is

granted.[57]

---

[55]     See Defendant's Memorandum of Law in Support of Its Motion for
Leave to File an Amended Answer ("Def. Rule 15 Mem.") at 9. At conferences on
February 14, 2005, and May 18, 2005, I authorized limited discovery concerning
Love Funding's liability under the MLPA and several other narrow issues. *See*
2/14/05 Transcript at 3; 6/18/05 Transcript at 29. Love Funding now states that
the Trust has taken the position that it is not required to provide discovery relevant
to the champerty defense until after the summary judgment motions are decided.
*See* Def. Rule 15 Mem. at 9.

[56]     *Randolph Found. v. Duncan*, No. 00 Civ. 6445, 2002 WL 32862, at
*4 (S.D.N.Y. Jan. 11, 2002) (quoting *Rotter v. Leahy*, 93 F. Supp. 2d 487, 497
(S.D.N.Y. 2000)). *Accord Southern Boston Mgmt. Corp. v. BP Prods. N. Am.,
Inc.*, No. 03 Civ. 6845, 2004 WL 2624891, at * 2 (S.D.N.Y. Nov. 18, 2004)
("When the motion to amend is opposed on futility grounds, the court will review
the proposed amended pleading for adequacy as defined by Federal Rule of Civil
Procedure 12(b)(6).").

[57]     *Schwimmer v. Guardian Life Ins. Co.*, No. 93 Civ. 0248, 1996 WL
146004, at *3 (S.D.N.Y. Apr. 1, 1996). Although I am skeptical that the
assignment is champertous, the liberal pleading standard, under which every
reasonable inference must be drawn in Love Funding's favor, compels me to allow

**B.    Love Funding's Motion for Summary Judgment Concerning the Definition of "Repurchase Price"**

The Trust seeks damages under the "Repurchase Price," which is a defined term in the MLPA.  While the Trust has created some confusion in its submissions to the Court, it seeks the sum of (1) the principal of the Arlington Loan and (2) interest calculated after an event of default, as defined in the Mortgage Note.[58]  Love Funding argues that the fixed rate of interest set forth in the Mortgage Note — here 8.05 percent — should be applied rather than the higher rate of interest following an event of default.

The MLPA defines "Repurchase Price," in pertinent part, as "a price equal to (i) the Stated Principal Balance of the Mortgage Loan, plus (ii) interest on such Stated Principal Balance at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to [PWRES] to the date of repurchase."[59]  The MLPA defines "Mortgage Interest Rate" as "[t]he annual rate of interest borne on a Mortgage Note which shall be adjusted from time to time,

_____

discovery.  The Trust may move for summary judgment as soon as discovery on this issue is complete.

[58]    *See* Letter of Kenneth S. Yuddell, Counsel to the Trust, to Alec W. Farr, Ex. 5 to Affidavit of Howard M. Rogatnick, Counsel to Love Funding, at 1.

[59]    MLPA § 1.01.

with respect to Adjustable Rate Mortgage Loans, in accordance with the provisions of the Mortgage Note."[60]

Thus, the MLPA provides that the Mortgage Note determines the interest available to the Trust under the definition of Repurchase Price. Specifically, the MLPA states that this interest rate can be either a fixed rate or, in the case of an Adjustable Rate Mortgage Loan, a variable interest rate. The Mortgage Note for the Arlington Loan provides that the "Applicable Interest Rate" is fixed at an annual rate of interest of 8.05 percent.[61] The Mortgage Note further states that

> [Cyrus] hereby agrees that upon the occurrence of an Event of Default or upon the failure of [Cyrus] to pay the Debt in full upon the Maturity Date, [Love Funding] shall be entitled to receive and [Cyrus] shall pay interest on the entire unpaid principal sum at the rate per annum equal to the greater of (i) 5% per annum above the Applicable Interest Rate or (ii) 5% per annum above the Base Rate (hereinafter defined) in effect at the time of the occurrence of default (the 'Default Rate').[62]

---

[60]    *Id.* An "Adjustable Rate Mortgage Loan" is "[a] Mortgage Loan under which the Mortgage Interest Rate is adjusted from time to time in accordance with the terms and provisions of the related Mortgage Note." *Id.*

[61]    *See* Mortgage Note, Ex. D to Farr Decl., at 1.

[62]    *Id.* at 3. The Mortgage Note defines an "Event of Default" as a failure by Cyrus to make any payment on the Mortgage Note or any other default under the terms of the Mortgage. *See id.* at 2. In addition, "[t]he term 'Base Rate'

-17-

Thus, the Mortgage Note provides that the Default Rate replaces the Applicable Interest Rate of 8.05 percent in the event that Cyrus defaults on the Arlington Loan.

Love Funding argues that the MLPA's definition of Repurchase Price bars the application of the Default Rate because the Mortgage Note is a fixed-rate mortgage and, as defined in the MLPA, the Mortgage Interest Rate will be increased to the Default Rate only in the case of Adjustable Rate Mortgage Loans. This is a strained reading of the definition of Mortgage Interest Rate. *First*, the phrase "from time to time" concerns fluctuations in the interest rate that occur only in the case of Adjustable Rate Mortgage Loans, and has no meaning in the context of a default on the loan. *Second*, Love Funding's interpretation would result in default interest being available under the MLPA if a Mortgage Note bears a variable rate of interest, but unavailable if it bears a fixed rate, when there is no logical reason for such a distinction. Therefore, the definition cannot reasonably be construed, as Love Funding urges, to prevent the Default Rate from applying to

---

shall mean the annual rate announced by Citibank, N.A., in New York City, New York as its base rate in effect at the time of the occurrence of the Event of Default." *Id.* at 3.

fixed-rate mortgages.[63]

The only reasonable interpretation is that the Mortgage Interest Rate is simply "[t]he annual rate of interest borne on a Mortgage Note" — a rate of interest that the definition specifies may vary "from time to time" in the case of Adjustable Rate Mortgages, without excluding other adjustments mandated by the Mortgage Note. As explained above, under the terms of the Mortgage Note, the annual rate of interest on the Arlington Loan is 8.05 percent before a default and the Default Rate after a default occurs. Thus, the Repurchase Price consists of the principal plus interest calculated at the Default Rate.[64] Accordingly, Love Funding's motion for summary judgment concerning damages available under the MLPA's definition of Repurchase Price must be denied.

---

[63]     *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) ("Where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning, the question of interpretation is one of law to be answered by the court.") (quotation marks omitted).

[64]     Love Funding's concern that this construction of the Repurchase Price might result in a windfall for the Trust is unfounded. As discussed below, under the terms of the MLPA, when the Trust's assignor, PWRES, learned of Cyrus's breach of the Mortgage, it was required to provide prompt written notice to Love Funding. Thus, PWRES could not accumulate default interest by remaining silent about the default without itself breaching the MLPA. As a result of its own breach, PWRES and thus its assignee are liable for damages that must be offset against the Repurchase Price.

**C.    Cross-Motions for Summary Judgment Regarding Love
         Funding's Liability Under the MLPA**

**1.    The Trust's Motion**

In its motion for summary judgment, the Trust seeks a determination

that Love Funding has breached section 5.02(cc) of the MLPA, in which Love

Funding warranted that "there is no default, breach, violation or event of

acceleration" on the Mortgage at the time it was sold to PWRES.  Love Funding

counters that there is at least an issue of fact as to whether it has breached this

warranty.[65]

As an initial matter, it is undisputed that Cyrus committed fraud in

obtaining the Arlington Loan, which constitutes an "Event of Default" under the

terms of the Mortgage.  Love Funding has raised no facts to challenge the

overwhelming evidence of Cyrus's fraud, which includes the testimony of former

employees and the fraudulent documents themselves.[66]  Nor is it disputed that

---

[65]    In addition, Love Funding argues that it has raised a genuine issue of
material fact in connection with its champerty defense, which precludes summary
judgment in the Trust's favor.  However, champerty is an affirmative defense,
which if successful would bar the Trust's claims but is irrelevant to the narrow
issue of whether Love Funding breached section 5.02 of the MLPA.  *See Bluebird*,
94 N.Y.2d at 735 (referring to champerty as an affirmative defense).

[66]    It should be noted that the Louisiana court's determination that Cyrus
committed fraud could not possibly have any preclusive effect in this action,
because Louisiana does not recognize the doctrine of issue preclusion, or collateral

Love Funding was unaware of this fraud at the time it assigned the Arlington Loan

to PWRES pursuant to the MLPA. The question is whether Love Funding's lack

of knowledge is a material fact sufficient to withstand summary judgment.

Love Funding contends that section 5.02(cc) is reasonably susceptible

to two interpretations. The first, advanced by the Trust, is that by representing that

"[t]here is no default, breach, violation or event of acceleration existing under the

related Mortgage or the related Mortgage Note," Love Funding became strictly

liable for any such default, without regard to its knowledge. The second,

advanced by Love Funding, is that in accordance with "common industry usage,"

any such default, breach, violation or event of acceleration is a condition that must

be *declared* by the lender, Love Funding.[67] This interpretation implies that Love

Funding would have to have been aware of the default in order to make such a

declaration.

The Second Circuit has explained that "[i]n interpreting a written

---

estoppel. *See Steptoe v. Lalli Kemp Hosp.*, 634 So. 2d 331, 335 (La. 1994); *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77 (2d Cir. 2005) (Full Faith and Credit Act requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state).

[67]    Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment ("Def. Opp. Mem.") at 9; Declaration of Karen L. Ford Concerning the MLPA ¶¶ 15-16.

contract, a trial court's primary goal is to effectuate the intent of the parties as manifested by the language used in the contract."[68]  Moreover,

> When the question is the contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. . . . Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business."[69]

The Second Circuit warns, however, that "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations."[70]

The meaning of section 5.02(cc) is unambiguous.  Although the MLPA does not define the terms "default," "breach," "violation," and "event of acceleration," there is no indication that the parties intended to assign these legal terms anything other than their ordinary meaning.[71]  Indeed, other language in section 5.02(cc) belies Love Funding's interpretation.  The entire first sentence of

---

[68]     *Aetna*, 404 F.3d at 598.

[69]     *Id.* (quoting *Eskimo Pie Corp. v. Whitelawn Diaries, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968)).

[70]     *Id.*

[71]     *See, e.g.,* Black's Law Dictionary 449 (8th ed. 2004) (defining default as "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due.").

that section reads: "There is no default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note and no event (other than payments due but not yet delinquent) which, with the passage of time or with notice and the expiration of any grace or cure period, *would constitute a default, breach, violation or event of acceleration*."[72] If a "default" is something that must be declared, as Love Funding urges, then it would be impossible for an event to constitute a default with the passage of time.[73] Finally, the MLPA uses the word "declare" when referring to the declaration of a default. In section 5.02(cc), Love Funding also warranted that "no Person other than the holder of such Mortgage Note may *declare an event of default* or accelerate the related indebtedness under any such Mortgage Loan."[74] Thus, the MLPA distinguishes between a default and the declaration of an event of default. Because the terms "default", "breach," "violation," and "event of acceleration" are not reasonably susceptible to the interpretation offered by Love Funding, there is no ambiguity in section 5.02(cc).

---

[72]    MLPA § 5.02(cc) (emphasis added).

[73]    *Cf. Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (1984) (noting that in construing a contract, a court must avoid an interpretation that would leave a contractual clause meaningless).

[74]    *Id.* (emphasis added).

Thus, under the plain language of section 5.02(cc), Love Funding is strictly liable for a "default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note." It follows that Love Funding's lack of knowledge of Cyrus's fraud in the origination of the Arlington Loan is not a material fact. Consequently, the Trust's summary judgment motion for a determination that Love Funding breached the warranty in section 5.02(cc) of the MLPA is granted.[75]

## 2. Love Funding's Cross-Motion

Love Funding cross moves for a determination that, regardless of any breach on Love Funding's part, the Trust's claims under the MLPA are barred on the following grounds: (1) the failure of the Trust's assignor, PWRES, to provide prompt written notice to Love Funding of Cyrus's default; (2) PWRES's failure to demand that Love Funding repurchase the Arlington Loan within a reasonable time; (3) the doctrine of impossibility; and (4) laches.

### a. Prompt Written Notice

Section 5.03 of the MLPA provides that a party discovering a breach

---

[75] *See Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity.").

of any of Love Funding's representations and warranties "shall give prompt written notice to the other."[76] While Love Funding has admitted that it was "generally aware" of Cyrus's fraud, through its participation in third-party discovery in the various lawsuits regarding the Arlington Loan,[77] it is undisputed that PWRES never provided Love Funding written notice of Cyrus's fraud. Love Funding argues that PWRES's failure to provide prompt written notice bars the claim of its assignee, the Trust, because the prompt written notice provision is a condition precedent to Love Funding's obligation to cure or repurchase the Arlington Loan.

Under New York law, "[i]n determining whether a particular agreement makes an event a condition courts will interpret doubtful language as embodying a promise or constructive condition rather than an express condition."[78] The language of the MLPA is not doubtful at all: the notice requirement is not a condition precedent with respect to Love Funding's obligation to cure the breach or repurchase the Arlington Loan. The MLPA

---

[76]    MLPA § 5.03(a).

[77]    Def. Opp. Mem. at 18.

[78]    *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691 (1995).

requires Love Funding to cure or repurchase "within sixty (60) days of *either discovery by* or notice to [Love Funding] of any Breach of a representation or warranty."[79] Thus, Love Funding's obligation is independent of its receipt of prompt written notice because, under the terms of the contract, the obligation can also arise upon its own discovery of a breach.[80] Consequently, PWRES's breach of the prompt written notice provision at most gives rise to a setoff against its assignee, the Trust.

### b. PWRES's Failure to Demand that Love Funding Repurchase the Arlington Loan

Section 5.03(b) of the MLPA provides that if Love Funding cannot cure its breach of a representation or warranty, it "shall, at [PWRES's] option, repurchase [the Arlington Loan] at the Repurchase Price."[81] Love Funding argues that PWRES's failure to make a timely demand that Love Funding repurchase the

---

[79]     MLPA § 5.03(b) (emphasis added).

[80]     *Cf. LaSalle Bank Nat'l Assoc. v. Citicorp Real Estate, Inc.*, No. 02 Civ. 7868, 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) (interpreting prompt-notice provision as a promise rather than a condition precedent where the defendant's obligation to cure or repurchase a mortgage loan was triggered either when the defendant received notice of or discovered on its own a breach of its representations and warranties).

[81]     MLPA § 5.03(b).

Arlington Loan bars the claims of its assignee, the Trust.[82] There is no basis for

this argument in the language of the MLPA, which does not make the exercise of

this option in a timely manner a condition precedent to Love Funding's obligation

to repurchase the loan.[83] Thus, Love Funding is not entitled to summary judgment

on the ground that PWRES failed to timely demand that Love Funding repurchase

the Arlington Loan.[84]

### c.    Impossibility

Love Funding also contends that the Trust's claims are barred by the

doctrine of impossibility because the Arlington Loan no longer exists. This

contention is based on a faulty premise. The MLPA's definition of Mortgage

Loan states that such a loan "includes without limitation . . . Liquidation Proceeds,

---

[82]    The MLPA is silent as to when PWRES must exercise its option. Love Funding asserts that the industry custom is that such an option must be exercised within two to three months of the discovery of fraud in the origination of a loan. *See* Esquivel Op. at 4.

[83]    *See Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (quotation marks omitted).

[84]    Nevertheless, to the extent that through its own delay PWRES aggravated its injuries stemming from Love Funding's breach, which presents an issue of fact, the Trust's recovery should be reduced accordingly. *See, e.g., Clark Oil v. Trading Co. v. J. Aron & Co.*, 683 N.Y.S. 2d 12, 14 (1st Dep't 1998) ("[T]he nonbreaching party is required to mitigate its own injuries.").

Condemnation Proceeds, Insurance Proceeds, and all other rights, benefits, proceeds, and obligations arising from or in connection with such Mortgage Loan."[85] Even though the mortgage has been foreclosed, several components of the Arlington Loan continue to exist, which can be repurchased by Love Funding, including the Louisiana court's judgment against Cyrus in favor of the Trust and the proceeds, which are held by a receiver, from the court-ordered sale of the Property. Therefore, Love Funding's performance is not impossible.

### d.    Laches

Finally, Love Funding argues that the Trust's claims should be equitably barred under the doctrine of laches.[86] "Because laches is a purely equitable defense, it will not serve to bar recovery in an action at law commenced within the limitations period. As such, unless the legal right is barred by the [s]tatute of [l]imitations, the equitable remedy is not barred by the doctrine of laches."[87] Although the Trust seeks the equitable remedy of specific performance,

---

[85]    MLPA § 1.01.

[86]    *See Saratoga County Chamber of Commerce, Inc. v. Pataki*, 100 N.Y.2d 801, 816 (2003) ("We have defined laches as an equitable bar, based on a lengthy neglect or omission to assert a right and the resulting prejudice to an adverse party.").

[87]    *Ecumenical Task Force of Niagara Frontier, Inc. v. Love Canal Area Revitalization Agency*, 583 N.Y.S. 2d 859, 862 (4th Dep't 1992) (citations

this is an action at law for breach of contract that was brought within the applicable six-year statute of limitations. The affirmative defense of laches is therefore inapplicable.

## V. CONCLUSION

To summarize, the Court has made the following rulings: (1) Love Funding's motion for leave to amend its answer is GRANTED; (2) Love Funding's motion for summary judgment to bar the application of the Default Rate of interest is DENIED; (3) the Trust's motion for summary judgment as to Love Funding's breach of section 5.02(cc) of the MLPA is GRANTED; and (4) Love Funding's cross-motion for summary judgment that it cannot be liable under the MLPA because the Trust's claims are barred is DENIED. The Clerk of the Court is directed to close these motions (docket # 18, 26, 30 and 39).

Now that the Court has found that Love Funding breached the MLPA, the parties must expeditiously complete discovery on all remaining issues. A

---

omitted). *Accord Int'l Ass'n of Machinists and Aerospace Workers v. Allegis Corp.*, 545 N.Y.S. 2d 638, 643 (Sup. Ct. N.Y. Co. 1989) ("An action for an equitable remedy to enforce a legal right is not barred by inaction until the legal remedy is barred by the statute of limitations."); *Bohemian Brethren Presbyterian Church v. Greek Archdiocesan Cathedral of Holy Trinity*, 405 N.Y.S. 2d 926, 929 (Sup. Ct. N.Y. Co. 1979) ("[A]n action for an equitable remedy in aid of or to enforce a legal right is not barred by inaction until the legal remedy is barred by the statute of limitations.").

conference to set the remaining discovery schedule is set for October 18, 2005 at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           October 7, 2005

## - Appearances -

**For Plaintiff:**

Kenneth S. Yudell, Esq.
Aronauer, Goldfarb, Re & Yudell, LLP
444 Madison Avenue, 17th Floor
New York, New York 10022
(212) 755-6000


**For Defendant:**

Alec W. Farr, Esq.
Howard M. Rogatnick, Esq.
Bryan Cave LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000