UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
TRUST FOR THE CERTIFICATE    :
HOLDERS OF THE MERRILL LYNCH :
MORTGAGE INVESTORS, INC.     :
MORTGAGE PASS-THROUGH    :
CERTIFICATES SERIES 1999-C1,   :
by and through ORIX Capital Markets, :
LLC, as Master Servicer and Special  :
Servicer,                    :
            Plaintiff,    :
                          :
   - against -        :
                          :
LOVE FUNDING CORPORATION,  :
                          :
           Defendant.   :
-----------------------------------------------------X

SHIRA A. SCHEINDLIN, U.S.D.J.:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/27/07

OPINION AND ORDER

04 Civ. 9890 (SAS)

I.    INTRODUCTION

        The Trust for the Certificate Holders of the Merrill Lynch Mortgage

Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 ("Trust")

brings this action against Love Funding Corporation ("Love Funding") for breach

of contract. The Trust's claim arises from Love Funding's breach of

representations and warranties set forth in a Mortgage Loan and Purchase

Agreement ("Love MLPA") between Love Funding and Paine Webber Real Estate

Securities, Inc. ("PWRES"), whose successor, UBS Paine Webber ("UBS"),[1]

---
[1]    PWRES is hereafter referred to as UBS.

subsequently assigned its rights under the Love MLPA to the Trust.[2]  Because this

Court has already determined, as a matter of law, that Love Funding breached one

of its warranties under the Love MLPA,[3] the issues remaining for trial included

Love Funding's affirmative defense of champerty and the amount of damages, if

any, the Trust may recover from Love Funding.  A bench trial was held from

January 17, 2007 to January 23, 2007.  The following constitutes the Court's

findings of fact and conclusions of law.

## II.   CHAMPERTY

New York statutory law provides that:

no corporation or association, directly or indirectly, itself or by
or through its officers, agents or employees, shall solicit, buy or
take an assignment of, or be in any manner interested in buying
or taking an assignment of a bond, promissory note, bill of
exchange, book debt, or other thing in action, or any claim or
demand, *with the intent and for the purpose of bringing an
action or proceeding thereon.*[4]

Interpreting the champerty statute's "intent and purpose" requirement, the New

---

[2]    New York law governs the interpretation of the Love MLPA and determines
the parties' rights and obligations thereunder. *See* Love MLPA § 9.05, Joint
Exhibit ("JX") 1.

[3]    *See Trust for the Certificate Holders of the Merrill Lynch Mortgage
Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 v. Love
Funding Corp.* ("*Trust I*"), No. 04 Civ. 9890, 2005 WL 2582177, at *7 (S.D.N.Y.
Oct. 11, 2005).

[4]    N.Y. Jud. L. § 489(1) (McKinney 2007) (emphasis added).

York Court of Appeals has held that:

> [I]n order to constitute champertous conduct in the acquisition of rights . . . the foundational intent to sue on that claim must at least have been the primary purpose, if not the sole motivation behind, entering into the transaction . . . . The bottom line is that Judiciary Law § 489 requires that the acquisition be made with the intent and for *the* purpose (as contrasted to *a* purpose) of bringing an action or proceeding.[5]

Importantly, "'the question of the intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts.'"[6]

The policy behind the champerty doctrine is to "prevent the resulting strife, discord and harassment which could result from permitting attorneys and corporations to purchase claims for the purpose of bringing actions thereon . . . ."[7] Champerty "does not embrace a case where some other purpose induced the purchase [or assignment]," and the intent to sue "was merely incidental and

---

[5]  *Bluebird Partners, L.P. v. First Fidelity Bank, N.A.*, 94 N.Y.2d 726, 736 (2000). *Accord Elliott Assocs., L.P. v. Banco de La Nacion*, 194 F.3d 363, 381 (2d Cir. 1999) (holding that New York's champerty statute was not violated where the "accused party's primary goal [was] found to be the satisfaction of a valid debt and its intent is only to sue absent full performance" (quotations and citation omitted)); *Semi-Tech Litig., L.L.C. v. Bankers Trust Co.*, 272 F. Supp. 2d 319, 331 (S.D.N.Y. 2003).

[6]  *Bluebird*, 94 N.Y.2d at 738 (quoting *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 330 (1971)). *See also id*. at 735 (observing that the limited scope of the doctrine should leave courts "hesitant" to find champerty at the summary judgment stage).

[7]  *Fairchild*, 28 N.Y.2d at 330.

contingent."[8]

## III.  FINDINGS OF FACT

### A.  The Parties[9]

The Trust is a New York trust created pursuant to an agreement dated November 1, 1999, between Merrill Lynch Mortgage Investors, Inc. ("MLMI"), as Depositor, Orix Capital Markets, LLC ("Orix"), as Master and Special Servicer, and Norwest Bank Minnesota, N.A., as Trustee. Love Funding is a Virginia corporation with its principal place of business in Washington, D.C. It is "a full-service, commercial mortgage-banking firm" that "offers loan placement services for borrowers, and origination, consulting and servicing of loans for investors."[10]

### B.  The Arlington Loan[11]

On or about July 6, 1999, Love Funding made a $6.4 million mortgage loan ("Arlington Loan") to Cyrus II Partnership ("Cyrus"). The loan is evidenced by a Promissory Note ("Note") in the original principal amount. The Note was secured by, among other things, a Mortgage Security Agreement and

---

[8]   *Sprung v. Jaffe*, 3 N.Y.2d 539, 544 (1957) (finding a triable issue of fact raised by defendant's affirmative defense of champerty).

[9]   All facts set forth in Part III.A are taken from the Joint Statement of Undisputed Facts ("Joint Stmt.").

[10]   Love Funding, *Company Profile, at* http://www.lovefunding.com/about/profile.shtml.

[11]   Unless otherwise noted, all facts in Part III.B are taken from the Joint Stmt.

4

Assignment of Leases and Rents ("Mortgage"), which was a lien on Cyrus's

property known as the Arlington Apartments located in Harvey, Louisiana. The

Note was further secured by a Guaranty of Borrower's Recourse Obligations,

executed by Mondona Rafizadeh, a principal of the Borrower. Before entering into

the Arlington Loan, Love Funding conducted certain due diligence, which included

collecting information, performing limited lease audits, and making site visits to

the Arlington property.

Love Funding made the Arlington Loan pursuant to a conduit lending

arrangement it had entered into with UBS in early 1999. Under this arrangement,

Love Funding would find prospective loans for UBS to underwrite. Love Funding

was the lender in these transactions, but UBS actually funded the loans, which

were assigned to UBS. Love Funding and UBS memorialized the terms of this

relationship in the Love MLPA, which is dated April 23, 1999, and was drafted by

UBS. In the Love MLPA, Love Funding made certain representations and

warranties concerning the individual mortgage loans. Section 5.02 of the Love

MLPA reads, in pertinent part:

> . . . [A]s to each Mortgage Loan, the Seller hereby makes the
> following representations and warranties to the Purchaser as of
> each related Closing Date:
>
> [paragraphs omitted]
>
> (cc)   There is no default, breach, violation or event of
>        acceleration existing under the related Mortgage or the

related Mortgage Note.[12]

Section 5.03 of the Love MLPA defines the Purchaser's (UBS's) remedies in the

event of a breach of the Seller's (Love Funding's) representations and warranties.

It states, in pertinent part:

>    (a)    . . . [U]pon discovery by either the Seller or the Purchaser
>    of a breach of any of the foregoing representations and
>    warranties which materially and adversely affects the
>    value of any or all of the Mortgage Loans . . . the party
>    discovering such Breach shall give prompt written notice
>    to the other.
>
>    (b)    Within sixty (60) days of the earlier of either discovery
>    by or notice to the Seller of any Breach of a
>    representation or warranty, *the Seller shall cure* such
>    Breach in all material respects and, *if such breach cannot
>    be cured, the Seller shall, at the Purchaser's option,
>    repurchase such Mortgage Loan* at the Repurchase Price
>    . . . .[13]

The Love MLPA also includes an indemnification clause providing

that in addition to curing or repurchasing a defaulted loan, Love Funding shall

indemnify the Purchaser "from and against all demands claims or asserted claims .

. . costs and expenses, including reasonable attorneys' fees incurred . . . in any way

arising from or related to any breach of any representation [or] warranty . . . of the

---

[12]    Love MLPA § 5.02.

[13]    *Id*. § 5.03 (emphasis added).  This Court previously held that the term
"Repurchase Price," as used in the Love MLPA, consists of the stated principal
balance, simple interest and default interest accrued on the Arlington Loan. *See
Trust I*, 2005 WL 2582177, at *5.

Seller hereunder."[14]

The Arlington Loan was assigned to UBS pursuant to the Love MLPA on July 6, 1999. As consideration for originating the Arlington Loan, Love Funding received a fee of $64,000. UBS then sold the Arlington Loan to MLMI who, in turn, transferred the Arlington Loan to the Trust in November 1999 as part of a larger commercial mortgage-backed securities transaction involving numerous loans. As part of this transaction, MLMI and UBS entered into an MLPA ("MLMI MLPA") dated November 1, 1999.[15] Under the MLMI MLPA, UBS made several representations and warranties concerning these loans, including ones substantively similar to those made by Love Funding in section 5.02(cc) of the Love MLPA. The MLMI MLPA also contained a provision similar to section 5.03 of the Love MLPA, requiring UBS to either cure any breach of a representation or warranty or, if such breach could not be cured, to repurchase the problem loan.

## C.   The Borrower's Fraud

It is undisputed that Cyrus committed fraud in obtaining the Arlington Loan.[16] It is also undisputed that Love Funding was unaware of this fraud at the

---

[14]   Love MLPA § 9.14(a).

[15]   Love Funding was not a party to the MLMI MLPA.

[16]   A Louisiana court found the evidence of Cyrus's fraud overwhelming. That conduct included the submission of fake leases and a false rent roll, borrower certificate, loan application and financial statement to Love Funding. *See Cyrus II*

7

time it assigned the loan to UBS pursuant to the Love MLPA.[17]  The Trust and

Love Funding stipulate that by March 2002 and sometime in the fall of 2002,

respectively, they each had knowledge of Cyrus's underlying fraud.[18]  Under the

terms of the Mortgage, this fraud constituted an event of default resulting in an

acceleration of the loan.[19]  The parties' knowledge of the fraud also triggered

section 5.03(a) of the Love MLPA, which obligates each of the Seller and

Purchaser to promptly notify the other upon discovering any breach of a

representation or warranty that materially and adversely effects the value of a

mortgage loan.  Despite this mutual obligation, neither party, upon learning that the

Arlington Loan had been induced by lies and forged documents, notified the other.

In *Trust I*, this Court found that UBS's failure to promptly notify Love Funding of

---

*P'ship v. Orix Capital Mkts., LLC*, Docket No. 578-417, slip op. at 13 (Jefferson
Parish Ct. Dec. 23, 2004), JX 72.

[17]     In *Trust I*, familiarity with which is presumed, this Court found Love
Funding strictly liable for breaching representations and warranties under section
5.02(cc) of the Love MLPA. *See* 2005 WL 2582177, at *7.

[18]     *See* Joint Stmt. ¶ 51 (the Trust discovered facts suggesting Cyrus's fraud by
March 13, 2002).  Andrew S. Love, a Love Funding board member, testified that
by the fall of 2002, Love Funding knew "the borrower had done plenty wrong."
Trial Transcript ("Tr.") at 393-96.

[19]     *See* Mortgage § 20 (stating that the debt shall become immediately due upon
an event of default, and that the submission of any false or misleading document
by Cyrus constituted an event of default), JX 3.

8

Cyrus's fraud constituted a breach of the Love MLPA.[20]

## D.    The MLMI Litigation

Between April and August 2002, the Trust demanded that UBS repurchase the Arlington Loan pursuant to the MLMI MLPA.[21]  UBS rejected this demand, and in September and October 2002, the Trust instituted various lawsuits against UBS (collectively known as the "MLMI Litigation") related to, *inter alia*, the sale of over thirty loans by UBS to the Trust, including the Arlington Loan.[22] For the next two years, the Trust and UBS engaged in what is referred to colloquially as scorched earth litigation; it proceeded in one federal court, two Texas state courts and New York state court, involved approximately seventy attorneys at ten separate law firms, and spent tens of millions of dollars in legal fees.[23]

---

[20]     *See Trust I*, 2005 WL 2582177, at *7 n.64.  At trial, Love Funding argued that its failure to provide notice to UBS was reasonable, given that by the time it learned of Cyrus's default, it was aware that UBS already knew of the fraud. *See* Tr. at 393-96 (Love).  It also argued that it did not perceive that it had breached the Love MLPA by virtue of Cyrus's fraud. *See id.*  My previous ruling did not address whether Love Funding's failure to provide notice constituted a breach of section 5.03(a).  As set forth below, whether or not Love Funding breached its duty to give notice to UBS under the Love MLPA is irrelevant.

[21]     *See* Joint Stmt. ¶¶ 72, 74.

[22]     *See id.* ¶¶ 78-84.

[23]     The Trust purportedly spent $7 million in legal fees; UBS purportedly spent over $30 million. *See* Tr. at 199-201 (Dinan).  To the extent the Trust seeks

UBS fiercely defended the claims brought by the Trust. Although the
Arlington Loan was not the only loan at issue, the Trust acknowledged that it was
one of the "poster child" loans that sparked and drove the MLMI Litigation.[24]
Surprisingly, however, neither the Trust nor UBS saw fit to involve Love Funding
in their dispute over the Arlington Loan. And although Love Funding was in
communication with both UBS and the Trust before and during the MLMI
Litigation,[25] neither party notified Love Funding that it believed Love Funding was
liable for damages stemming from the Arlington Loan. As UBS and the Trust
engaged in a war of attrition, Love Funding watched from the sidelines; Love
Funding was never named as a party to their litigation.[26]

---

indemnification from Love Funding for UBS's MLMI Litigation costs, the Trust
limits this claim to attorneys' fees paid to a single law firm, Cahill, Gordon &
Reindel LLP, which represented UBS with respect to the Arlington Loan. *See*
Plaintiff's Trial Memorandum of Law ("Pl. Mem.") at 17.

[24]   Tr. at 198 (Dinan), 583-85 (Wurst).

[25]   The Trust first contacted Love Funding in April 2002 for the purpose of
obtaining third-party discovery that was ultimately used in the MLMI Litigation.
*See* Tr. at 279 (Simon). This discovery included Arlington Loan origination
documents and the deposition of several witnesses from Love Funding. *See id.*;
Joint Stmt. ¶¶ 80-81.

[26]   UBS did implead another loan originator, Wexford Bancgroup LLC, as a
third-party defendant in the MLMI Litigation. *See* Joint Stmt. ¶ 83. Wexford had
originated a loan secured by several properties referred to as the "Lee Hall Loan,"
and UBS sought indemnity from Wexford based on the terms and conditions of a
MLPA between Wexford and PaineWebber. *See id.*

10

In March 2002, the Trust had declared the Arlington Loan to be in default and accelerated the full amount of the loan, even though Cyrus was then current on all principal and interest payments.[27] The Trust also commenced a mortgage foreclosure action in Louisiana, and on March 14, 2002, the Jefferson Parish Sheriff seized the Arlington Apartments and placed a receiver, referred to as a "keeper," in control of the property. [28]

## E.    Assignment of the Love MLPA

The Trust and UBS settled the MLMI Litigation on September 13, 2004. At the time they settled, there were thirty-three loans outstanding that had been originated by UBS and deposited into the Trust. Pursuant to the terms of a settlement agreement ("Settlement"), UBS and the Trust exchanged mutual releases as to any future claims relating to all of the loans, including the Arlington Loan. As consideration for its releases, UBS paid the Trust $19.375 million.[29] As John Dinan, Director of Distressed and Proprietary Assets at Orix, explained it, the purpose of this payment was to compensate the Trust for its losses on all of the

---

[27]    *See* Joint Stmt. ¶¶ 48-49.

[28]    *See id*. ¶¶ 52-55. The Trust also filed an action in Texas state court related to the Arlington Loan. *See id.* ¶ 55.

[29]    *See* Settlement, JX 62 ¶ 2.

loans from which it was releasing UBS, *except* the Arlington Loan.[30]  Instead, as

the Trust's sole consideration for releasing UBS from its obligations under the

Arlington Loan, UBS assigned to the Trust all of UBS's rights under the Love

MLPA.[31]

Dinan, who was in charge of handling the Arlington Loan for the

Trust and whose testimony I credit with respect to this issue, described how the

Arlington Loan came to be "carved out" from the rest of the Settlement. [32]  During

settlement negotiations, UBS and the Trust discussed various ways of settling the

Arlington Loan dispute.[33]  One option was that UBS would repay the Trust for its

overpayment to UBS for this now-defaulted loan.  At one point, the Trust had

requested that UBS pay it an additional "$4 or $5 million" as compensation for

Arlington.[34]

An alternative option, the one ultimately chosen, was the Assignment.

---

[30]     *See* Tr. at 88 (Dinan).

[31]     *See id*. at 77 (Dinan).  The actual assignment agreement was not negotiated
and signed by the parties until November 18, 2004, but by its terms it had become
effective September 13, 2004.  *See id*. at 77-82 (Dinan); Assignment of Claims and
Causes of Action ("Assignment"), JX 69.

[32]     *See* Tr. at 174-75 (Dinan).

[33]     *See id*. at 89-93 (Dinan).

[34]     *Id*. at 90 (Dinan).

Initially, however, the Trust was reluctant to accept the Assignment. Dinan testified that:

> I recall there being a discussion about, you know – if we take the assignment – if we take the assignment, then we're basically – which we did not want to do, you know, then we're just – *we're continuing a microcosm of the litigation that has already been going* on for the last three years with UBS.[35]

James Thompson, President and CEO of Orix USA,[36] characterized the Assignment similarly in an email he sent to Brian Harris of UBS a week before the Settlement was finalized. Thompson wrote: " . . . our [the Trust's] guys . . . do like the Love Funding claim, *but that's a whole new lawsuit*, which doesn't turn a lot of folks on."[37]

In sum, UBS and the Trust treated the Arlington Loan separately from all of the other MLMI Litigation loans. Not a cent of UBS's $19.375 million Settlement payment to the Trust was allocated to the Arlington Loan. The Trust took, as its sole consideration from UBS for losses related to Arlington, all of UBS's rights and claims against Love Funding under the Love MLPA.

---

[35] Defendant's Trial Memorandum of Law ("Def. Mem.") at 7 (citing Deposition of John Dinan, May 31, 2006 ("Dinan Dep."), at 139:05 – 140:10, Defendant's Exhibit ("DX") EE).

[36] Orix is hereafter referred to as the Trust.

[37] 9/07/04 Email from Thompson to Harris ("9/07/04 Thompson Email"), JX 58 (emphasis added).

## F.     The Trust Sues Love Funding

Although the Trust had been in contact with Love Funding since April 2002,[38] the Trust did not assert Love Funding's liability for Arlington-related losses until after acquiring the Assignment, in September, 2004.[39]  At trial, the Trust argued that upon becoming assignee, its representative, Michael Wurst, immediately called Love Funding with the intent of opening a dialogue between the parties that would obviate the need for litigation.[40]  Over the course of several telephone conversations with Karen Ford, Senior Vice President of Love Funding and/or Harry Cheatham, President and CEO of Love Funding, the Trust demanded that Love Funding either cure its breach or repurchase the Arlington Loan.[41] According to the Trust, even though Wurst never specified the cost of repurchase, Love Funding refused to cure or repurchase and instead requested "more information" as to why it was liable.[42]  In opposition to the Trust's contention, Love Funding asserted at trial that Wurst had specified a repurchase price.[43]  Ford

---

[38]     *See* Tr. at 279 (Simon).

[39]     *See id*. at 422-23 (Love), 489-90 (Ford), 336-40 (Wurst).

[40]     *See id*. at 23-24 (Trust opening statement), 339 (Wurst).

[41]     *See id*. at 423 (Love), 489-500 (Ford), 337-39 (Wurst).

[42]     *Id*. at 339 (Wurst).  *Accord id*. 97-102 (Dinan).

[43]     *See id*. at 70-72 (Love Funding opening argument).

testified on behalf of Love Funding with respect to this issue, and I credit her

testimony because she appeared to testify truthfully, there is some corroboration,

and because no evidence was offered to rebut her testimony.[44]  Ford testified that

during one of their telephone conversations, Wurst informed her that Love Funding

was liable to the Trust for slightly upwards of $10 million.[45]  Ford further testified

that she and others at Love Funding found this amount "shocking," as it far

exceeded the original amount of the loan and was approximately twice the total net

value of Love Funding.[46]  It bears noting that this amount also far exceeded the

Trust's own previous calculation of its losses with respect to Arlington

---

[44]     During the Trust's opening argument, the Court twice asked counsel for the
Trust whether, prior to filing suit, the Trust ever quoted Love Funding a price for
releasing it from liability under the Love MLPA. *See id.* at 23-24. The Trust
expressly stated that no monetary figure was ever mentioned, either orally or in
writing, but then failed to offer proof of this claim by, for example, calling Wurst
as a witness to rebut Ford's testimony. Nor did Wurst refute this testimony in his
deposition that was received in evidence.

[45]     *See id.* at 461-90 (Ford). It is unclear from Ford's testimony whether Wurst
indicated what comprised this $10 million-plus figure – *i.e.*, principal, interest, or
indemnification. On cross-examination, Ford was confronted with the fact that she
failed to mention this monetary demand during her pre-trial deposition, when she
was asked to recall the content of her fall 2002 conversations with Wurst. *See id.*
at 494-97. Ford explained that this omission had been a simple oversight on her
part. At deposition, she had been asked only generalized questions about these
conversations, and she only recalled the $10 million-plus demand upon reading the
Trust's pre-trial brief. *See id.* at 494.

[46]     *Id.* at 464-65 (Ford).

15

(approximately \$3 million),[47] as well as the \$4 or \$5 million the Trust had once been prepared to accept from UBS as compensation for releasing UBS from the Arlington Loan.[48]

In addition to Ford's testimony, Love Funding's contention that the Trust quoted a price approximating \$10 million is corroborated by the Trust's own damages calculations. In its pre-trial submissions to the Court, the Trust asserts over \$9 million in contract claims against Love Funding.[49] Lastly, Dinan testified that although he was not a party to all of the conversations between Wurst and Ford, he recalled Wurst asking him, at that time, to put a dollar amount on the Trust's potential exposure to certificate holders with respect to the Arlington Loan, to which Dinan answered it was "something in the nature of about \$10 million."[50]

On November 1, 2004 – approximately six weeks after the Trust and UBS executed their Settlement – the Trust filed a complaint against Love Funding

---

[47]     *See* 10/22/04 Email from Thompson to Harris ("10/22/04 Thompson Email"), DX Q. In this email exchange, Harris asked Thompson whether, with respect to Arlington, the Trust "really los[t] all that money [Thompson] said [it] would lose," and Thompson replied, "[r]ight now the loss on Arlington stands at a little over \$3 million." *Id*.

[48]     *See* Tr. at 90 (Dinan).

[49]     *See* Pl. Mem. at 13-17 (requesting \$9,210,941.93 in total damages).

[50]     Tr. at 101 (Dinan).

16

alleging breach of contract.[51]  Two days later, on November 3, the Trust wrote a

letter to Love Funding formally invoking section 5.03(b) of the Love MLPA.[52]

The letter states, in pertinent part: "The Trust demands that Love Funding cure

[its] Breaches or, if (but only if) cure is not possible, repurchase the Arlington

Loan at the Repurchase Price as required by Section 5.03 of the MLPA."[53]  The

letter also states that Love Funding may cure "through, without limitation, the

substitution of another qualifying mortgage loan . . .[,] defeasing the [loan], or

replacing the income lost to the Trust that was attributable to the Arlington Loan

net of principal and interest payments actually made to date by the Borrower."[54]

　　　　The Trust argues that this letter proves that it intended, upon

becoming assignee, to engage Love Funding in an effort to resolve its claims

without litigation.  However, this argument is contradicted by Wurst's own

deposition testimony.  When asked to describe how Cheatham and Ford responded

---

[51]　　*See* Complaint (the Trust initially filed this action in the Supreme Court of New York; the case was removed to federal court pursuant to sections 1332 and 1441 of the United States Code).  By November 2004, Cyrus had sold the property pursuant to court order for $6.7 million, of which the Trust ultimately received $5,912,150.78.  *See* Joint Stmt. ¶¶ 57-59, 67-68.

[52]　　*See* Joint Stmt. ¶ 86; Tr. at 98-99 (Dinan); 11/3/04 Letter from Wurst to Ford ("Demand Letter"), JX 67.

[53]　　Demand Letter at 2.

[54]　　*Id*. at 16.

to being told, in October 2004, that the Trust believed Love Funding was liable for

its Arlington-related losses, Wurst stated:

> My recollection was that they professed disagreement that
> representations and warranties had been breached . . . they
> wanted more information, and more, what do I say, description,
> facts articulation of the circumstances, some of which, as I
> recall, I gave them on the telephone, some of which followed
> either – I don't think there were any other communications. So
> the detailed description was contained, I think, in the demand
> letter of November 3rd . . . .[55]

But by the time the letter was written, the Trust had already initiated a lawsuit

against Love Funding. Thus, the Trust's portrayal of the letter as part of its

attempted "dialogue" with Love Funding is simply inaccurate, and its claim that it

offered Love Funding an opportunity to avoid litigation is disingenuous. These

conclusions are further supported by Love's testimony, which I credit, that by the

time the Trust made its demands on Love Funding, a cure was impossible (as the

fraud could not be undone), and a repurchase was not economically feasible given

the Trust's inflated demand and the impossibility of recouping funds from a

bankrupt borrower.[56]

Moreover, the letter did not clearly distinguish between the

alternatives of cure or repurchase, for under either scenario Love Funding would

have to pay the Trust millions of dollars in exchange for its release from any

---

[55]    Tr. at 339.

[56]    *See id*. at 383-89 (Love).

liability attendant to the now-extinguished loan. Nor did the letter specify a repurchase price or any other damages. At trial, Dinan testified that when the demand letter was written, "it was not the Trust's position that cure was impossible," but rather that "[the Trust] very much felt that there was a way" for Love Funding to effect a cure of its underlying breach.[57] Dinan also stated that upon taking the Assignment, the Trust "actually thought there would be a consensual settlement" with Love Funding.[58]

This testimony is simply not credible. No reasonable person, with knowledge of the posture of the loan in November 2004, would have expected Love Funding to pay millions of dollars in interest that had been accruing on the loan for years, or to pay for expenses UBS incurred as a result of the MLMI Litigation, in which Love Funding was never involved.

## G.    The Trust's Primary Purpose

At trial, Love Funding proved by a preponderance of the evidence that the Trust's primary purpose in accepting the Assignment was to buy a lawsuit against Love Funding. Critical to the Court's finding is the fact that after two years of angry and expensive litigation, the only compensation the Trust took in

---

[57]    *Id*. at 106 (Dinan). *Accord id*. at 343-44 (Wurst) ("The letter doesn't presuppose anything is curable, nor does it presuppose anything is incurable. It places that burden squarely on the shoulders of Love Funding.").

[58]    *Id*. at 112 (Dinan).

19

exchange for releasing UBS from the Arlington Loan – a "poster child"[59] of the MLMI Litigation – was the Assignment. The record is devoid of evidence suggesting why the Trust would consider the Assignment adequate consideration if its primary purpose was *not* to sue Love Funding thereunder. Quite literally, the Trust had negotiated for itself "a whole new lawsuit,"[60] with the intent to "basically . . . continu[e] a microcosm of the litigation that ha[d] already been going on for the last three years with UBS."[61]

From the Trust's perspective, a lawsuit against Love Funding could potentially reap millions of dollars more than the Trust had been prepared to accept from UBS on the Arlington Loan.[62] Under the Love MLPA, the Trust could sue (and is suing) Love Funding for the principal balance on the loan, as well as for millions of dollars in simple and default interest that have been accruing on the

---

[59]   *Id*. at 198 (Dinan), 583-85 (Wurst).

[60]   9/07/04 Thompson Email.

[61]   Def. Mem. at 7 (quoting Dinan Dep. at 139:05 – 140:10).

[62]   As noted above, during settlement negotiations the Trust requested $4 or $5 million from UBS (in addition to the $19.375 million) in exchange for releasing UBS from the Arlington loan, but UBS rejected the proposal. *See infra* Part III.D.; Tr. at 90 (Dinan).

loan for years.[63]  Because simple interest began accruing shortly after the Trust

notified Cyrus that the loan was in default, in January 2002, it now totals over $2.5

million.[64]  And given a Louisiana court's finding that default interest began

accruing on the loan as of July 7, 1999, the Trust is now claiming additional

damages of approximately $2.4 million.[65]

       In accepting the Assignment, the Trust believed it could also

potentially recover indemnification damages from Love Funding under section

9.14 of the Love MLPA.  The Trust's particular attraction to this provision is clear

from the fact that section 9.14 is the *only* provision of the Love MLPA specifically

identified in the language of the Assignment.[66]  Under section 9.14, Love Funding

could be required to indemnify the Trust not only for attorneys' fees and costs

---

[63]    In its pre-trial submissions, the Trust argued that through January 17, 2007, the Repurchase Price totaled $11,227,403.87.  *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. Prop. Fact") ¶ 77.

[64]    *See id.* ¶ 75 (simple interest totaled $2,540,228.77 through January 17, 2007).

[65]    *See id.* ¶ 76 (default interest totaled $2,400,503.94 through January 17, 2007).

[66]    *See* Tr. 176-79 (Dinan).  The Assignment states, in pertinent part: "Assignor hereby absolutely and unconditionally grants, sells, bargains, transfers, assigns, sets-over and conveys unto the Trust each and every of the representations and warranties, and related remedies for breach thereof, under the PW-LF MLPA, *including but not limited to the remedies set out in section 9.14* of the PW-LF MLPA, in connection with each of the Trust's Love Funding Loans."  Assignment at 1 (emphasis added).

expended pursuing Love Funding,[67] but also for all attorneys' fees and costs

expended foreclosing on the property and pursuing Cyrus and Rafizadeh.[68]

Moreover, the Trust urges this Court to find that section 9.14 also obligates Love

Funding to indemnify the Trust for a portion of the legal fees UBS incurred during

the MLMI Litigation.[69]  Thus, the Trust had a strong incentive to sue Love Funding

from the time it accepted the Assignment.[70]

## IV.   CONCLUSIONS OF LAW

In response to the Trust's claim, Love Funding asserts the affirmative

defense of champerty.[71]  Although the champerty defense is rarely successful, I

conclude that the Trust's acceptance of UBS's rights under the Love MLPA is one

---

[67]     The Trust initially estimated these expenses, through October 31, 2006, at $549,032.12, *see* Plaintiff's Exhibits ("PX") 20-22, but has since stipulated to certain reductions in these claims. *See* Plaintiff's Annotated, Amended and Supplemental Proposed Findings of Fact and Conclusions of Law ("Pl. Annot.") at 14.

[68]     The Trust initially put these costs and expenses, through December 22, 2006, at $2,549,655.92, *see* PX 17-19, but has since stipulated to certain reductions in these claims. *See* Pl. Annot. at 15.

[69]     The Trust initially claimed it was entitled to collect $704,642.60 in indemnification for expenses incurred by UBS prior to the Assignment, *see* Pl. Mem. at 17, but has since stipulated to certain reductions in these claims. *See* Pl. Annot. at 16.

[70]     The Trust's pre-trial memorandum claims damages due from Love Funding totaling $9,210,941.93. *See* Pl. Mem. at 12-17.

[71]     *See* Def. Mem. at 5-8.

of those rare cases that requires voiding the assignment due to champerty.

The Trust argues, correctly, that champerty will not lie where the assignee's primary purpose is to obtain payment of a valid debt rather than to pursue a lawsuit, and the assignee makes a demand on the obligor before bringing suit.[72] The Trust points to its Demand Letter and Wurst's October 2004 phone calls as evidence that the Trust viewed litigation as a mere possibility upon becoming an assignee.[73] But as discussed above, the evidence at trial refutes this argument. Both the oral and written demands were a sham. As Thompson wrote in an email to Harris, the Trust's only purpose was "to chase Love Funding and the borrowers" even though doing so would "probably be long and difficult."[74]

The Trust relies on several decisions that support the proposition that champerty should be narrowly construed and that the filing of a lawsuit does not equate to champerty.[75] The Trust also cites cases where the champerty defense

---

[72]    *See* Plaintiff's Post-Trial Memorandum of Law ("Pl. Post Mem.") at 2-3 (citing *1015 Gerard Realty Corp. v. A & S Improvements Corp.*, 457 N.Y.S.2d 821, 822 (1st Dep't 1983) (rejecting champerty because assignee filed suit only after obligor rejected genuine opportunity to cure)).

[73]    *See* Pl. Mem. at 23.

[74]    10/22/04 Thompson Email.

[75]    *See* Pl. Mem. at 22-24.  For instance, the Trust relies heavily on *Elliott*, in which the Second Circuit held that merely intending to bring suit on a purchased claim does not constitute champerty; in order to be champertous, "the purchase must be made for the very purpose of bringing such suit."  194 F.3d at 374 (citing

23

failed.[76] But these cases are easily distinguished.[77] For example, none of the cases

involved a carve out of a single loan from a group of loans that were settled for

significant payments, nor do these cases cite any evidence that the party rebutting

the champerty defense had acknowledged that the claims they were about to

acquire amounted to "a whole new lawsuit."[78]

     In calculating the damages it seeks from Love Funding, the Trust

---

*Moses v. McDivitt*, 88 N.Y. 62, 65-67 (1882)). There was no champerty in *Elliot* because the record demonstrated that the plaintiff's "primary goal" in acquiring a debt instrument was "satisfaction of a valid debt," and that the plaintiff intended to resort to litigation only to the extent necessary to accomplish this goal. *Id.* at 381. By contrast, as discussed above, the record here shows that the Trust could not have realistically expected Love Funding to comply with its demands for cure or repurchase, and that the Trust's primary goal was to sue Love Funding. The Trust also cites *Banque de Gestion Privee-Sip v. La Republica de Paraguay*, but that case is inapposite because it simply granted summary judgment for plaintiffs where defendants failed to "show specific facts warranting a trial with respect to their champerty defense." 787 F. Supp. 53, 55-56 (S.D.N.Y. 1992) (quotation marks and citation omitted).

[76]   *See* Pl. Post Mem. at 1-3; *see also Bellarno Int'l Ltd. v. Irving Trust Co.*, 560 N.Y.S.2d 287, 288 (1st Dep't 1990) (not champerty where "plaintiff was not a stranger to the transaction"); *Williams Paving Co. v. United States Fidelity & Guar. Co.*, 413 N.Y.S.2d 73, 74-75 (4th Dep't 1979) (not champerty where assignee had pre-existing relationship with assignor); *American Express Co. v. Control Data Corp.*, 376 N.Y.S.2d 153, 154 (1st Dep't 1975) (same).

[77]   *See* Defendant's Supplemental Trial Memorandum of Law at 6-7 (distinguishing cases).

[78]   9/07/04 Thompson Email. *Cf. Koro Co. v. Bristol-Myers Co.*, 568 F. Supp. 280, 287-88 (D.D.C. 1983) (finding an assignment champertous where it was "split off from the other assets" and made "solely so to enable [assignee] to prosecute [claims thereunder] on a speculative basis").

24

contends that not a penny of its Settlement with UBS should be allocated to the

Arlington Loan. This is simply not credible and reveals that the true purpose of the

Assignment was to provide the Trust with the opportunity to obtain additional

funds if it could extract money from Love Funding by way of a lawsuit. It bears

repeating that neither the Trust nor UBS impleaded Love Funding throughout the

entire MLMI litigation leading up to the Assignment, and that the Trust, upon

becoming assignee, immediately demanded that Love Funding pay $10 million to

avoid litigation.

   I conclude that Love Funding has proved its defense of champerty.

Accordingly, the assignment of the Love MLPA is void and the Trust is not

entitled to any damages arising from Love Funding's breach of the Love MLPA.[79]

---

[79] If I had not found the Assignment to be void, the Trust's damages would be
limited to those incurred prior to September 30, 2002. In *Trust I*, I held that "to the
extent that through its own delay [UBS] aggravated its injuries stemming from
Love Funding's breach [of warranty] . . . the Trust's recovery should be reduced
accordingly." 2005 WL 2582177, at *7 n.84 (citing *Clark Oil v. Trading Co.*, 683
N.Y.S.2d 12, 14 (1st Dep't 1998)). Additionally, I held that UBS "could not
accumulate default interest by remaining silent" upon learning of Love Funding's
default. *Id.* at n.64. It is undisputed that UBS was on notice of Cyrus's fraud by
August 2002 and that the MLMI Litigation commenced in September 2002. *See*
Joint Stmt. ¶ 78. At that time, UBS could have mitigated its damages by either
repurchasing the loan from the Trust and then demanding that Love Funding
repurchase it, or impleading Love Funding as a third party defendant, as it did with
Wexford Bancgroup LLC. In deciding to forego any of these remedies and instead
to engage in protracted litigation over Arlington, UBS failed to mitigate the
damages it now seeks. *See Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d
Cir. 1985); *U.S. West Fin. Servs. v. Marine Midland Realty Credit Corp.*, 810 F.
Supp. 1393, 1402 (S.D.N.Y. 1993) ("[A]ny award of damages should be reduced

25

## IV.   CONCLUSION

Love Funding has proved by a preponderance of the evidence that the Trust accepted the assignment of the Love MLPA with the primary purpose of bringing a lawsuit against Love Funding. Because the assignment is void for champerty, the Trust is not entitled to any award of damages. The Clerk of Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
        February 27, 2007

---

by any unnecessary increase in damages due to the failure of the plaintiff to avoid them." (quotations and citation omitted)). Thus, any recovery to the Trust would be limited to those incurred through September 30, 2002, which total approximately $1,736,668.35. This is the repurchase price as of September 30, 2002, offset by the Trust's recovery from the borrower and proceeds from the sale of the Arlington property. It excludes indemnification to the Trust for costs incurred pursuing the borrower, as these expenses are disputed. *See* Def. Supp. Mem. at 9-10.

## - Appearances -

*For Plaintiff:*

Kenneth S. Yudell, Esq.
Aronauer, Goldfarb, Re & Yudell, LLP
444 Madison Avenue, 17th Floor
New York, NY 10022
(212) 755-6000

Amy Howell, Esq.
ORIX Capital Market, LLC
1717 Main Street
Dallas, TX 75201
(469) 385-1342

*For Defendant:*

Alec W. Farr, Esq.
Bryan Cave LLP
700 Thirteenth Street NW
Washington, DC 20005
(202) 508-6053

Robert D. Piliero, Esq.
Piliero Goldstein Kogan & Miller, LLP
10 East 53rd Street
New York, NY 10022
(212) 478-8501