UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

TRUST FOR THE CERTIFICATE
HOLDERS OF THE MERRILL LYNCH
MORTGAGE PASS-THROUGH
CERTIFICATES SERIES 1999-C1, by
and through ORIX Capital Markets,
LLC, as Master Servicer and Special
Servicer,

              Plaintiff,

        - against -

LOVE FUNDING CORPORATION,

          Defendant.

------------------------------------------------------ X

**OPINION AND ORDER**

**04 Civ. 9890 (SAS)**

8/13/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

The Trust for the Certificate Holders of the Merrill Lynch Mortgage

Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 ("Trust")

brings this action against Love Funding Corporation ("Love Funding") for breach

of contract.  The Trust's claim arises from Love Funding's breach of

representations and warranties set forth in a Mortgage Loan and Purchase

Agreement ("Love MLPA")[1] between Love Funding and Paine Webber Real

Estate Securities, Inc. ("Paine Webber"), whose successor, UBS Paine Webber

("UBS"),[2] subsequently assigned its rights under the Love MLPA to the Trust.

The Trust now seeks $18,004,175.37 in damages, reduced by a 5,916.515.17

million dollar offset, for a total of $12,087,660.20 including indemnification. In

accordance with *Trust Remand*,[3] Love Funding's affirmative defense of champerty

must fail. I therefore enter judgment in favor of the Trust and award the Trust

$1,737,540.94 in damages.

## II. BACKGROUND

### A. The Parties

The Trust is a New York trust created pursuant to an agreement dated

November 1, 1999, between Merrill Lynch [Click for Enhanced Coverage Linking

---

[1]      *See* Love MLPA, Ex. A to Affidavit of Howard Rogatnick, Counsel for Love Funding, In Support of Love Funding Motion for Summary Judgment.

[2]      In November 2000, Paine Webber's parent merged with UBS AG. *See* Joint Statement of Undisputed Facts ("JSUF") ¶ 10. Paragraph numbers refer to the parties' corrected and submitted version of the JSUF because the original contained a numbering discrepancy. For ease of reference, I refer to both entities throughout as "UBS."

[3]      *See Trust for the Certificate Holders of the Merrill Lynch Mortgage Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 v. Love Funding Corp.*, 591 F.3d 116 (2d Cir. 2010) ("*Trust Remand*").

2

Searches] Mortgage Investors, Inc. ("MLMI"), as Depositor; Orix Capital

Markets, LLC ("Orix"), as Master and Special Servicer; and Norwest Bank

Minnesota, N.A., as Trustee.  Love Funding is "a full-service, commercial

mortgage-banking firm" that "offers loan placement services for borrowers, and

origination, consulting and servicing of loans for investors."[4]

**B.    Procedural Posture**

In *Trust I*,[5] I determined as a matter of law that Love Funding

breached one of its warranties under Section 5.02(cc) of the Love MLPA.[6]  A

bench trial was held from January 17, 2007 to January 23, 2007 on the remaining

issues of Love Funding's affirmative defense of champerty and on the amount of

damages, if any, the Trust could recover from Love Funding.  Following the trial,

this Court held in *Trust II* that the assignment of UBS's claims under the Love

---

[4]    Love Funding Website, *About Love Funding,* http://lovefunding.com/
about/index.php (last visited Aug. 13, 2010).

[5]    *See Trust for the Certificate Holders of the Merrill Lynch Mortgage
Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 v. Love
Funding Corp.*, No. 04 Civ. 9890, 2005 WL 2582177 (S.D.N.Y. Oct. 11, 2005)
("*Trust I*").

[6]    *See id.*, at *7.  I found Love Funding strictly liable for the breach.
*See id.*  As such, its knowledge of the breach – or undisputed lack thereof – is
immaterial given the language of section 5.02(cc).

3

MLPA to the Trust was void for champerty, and as such, the Trust was not entitled
to any award of damages.[7]

On appeal, the Second Circuit certified three questions to the New
York Court of Appeals regarding the nature and scope of champerty under New
York law.[8]  Pursuant to the response of the New York Court of Appeals,[9] the
Second Circuit reversed *Trust II*, holding that the record could not support a
finding of champerty under New York law.  The Second Circuit remanded to this
Court for entry of judgment in favor of the Trust and for a calculation of
damages.[10]

### C.    Undisputed Facts[11]

---

[7]    *See Trust for the Certificate Holders of the Merrill Lynch Mortgage
Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 v. Love
Funding Corp.*, 499 F. Supp. 2d 314, 325 (S.D.N.Y. 2007) ("*Trust II*").

[8]    *See Trust for the Certificate Holders of the Merrill Lynch Mortgage
Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 v. Love
Funding Corp.*, 556 F.3d 100, 114 (2d Cir. 2009) ("*Trust Appeal*").

[9]    *See Trust for the Certificate Holders of the Merrill Lynch Mortgage
Investors, Inc. Mortgage Pass-Through Certificates, Series 1999 C-1 v. Love
Funding Corp.*, 13 N.Y.3d 190 (2009) ("*Trust Certification Resolution*").

[10]   *See Trust Remand*, 591 F.3d 116.

[11]   The following facts are taken from the JSUF.

4

### 1.    1999: Love MLPA and the Arlington Loan

On April 23, 1999, Love Funding entered into a conduit lending agreement with UBS in which Love Funding identified and then originated mortgage loans using funding provided by UBS.[12]  Love Funding subsequently assigned the loans to UBS and received a fee as consideration.  Love Funding and UBS memorialized this relationship in the Love MLPA.[13]  The Love MLPA included Love Funding's representations and warranties concerning the fitness of each of the loans assigned to UBS, a mutual notice obligation in the event of a breach of Love Funding's representations and warranties, a sequence of actions to be taken post-breach, and an indemnification provision requiring Love Funding to reimburse UBS for fees and costs associated with such a breach.[14]

On July 6, 1999, Love Funding made a 6.4 million dollar mortgage loan (the "Arlington Loan") to an entity known as Cyrus II Partnership ("Cyrus").

---

[12]    The original lending agreement was between Love Funding and Paine Webber.

[13]    UBS drafted the Love MLPA and sent it to Love Funding.  Karen Ford, Senior Vice President of Love Funding, signed on behalf of Love Funding after negotiations over certain terms.  *See* JSUF ¶ 14.

[14]    Each of these provisions is discussed in detail below in the Applicable Law section.

The Arlington Loan was evidenced by a promissory note (the "Note"), which, in turn, was secured by (1) a lien on a Cyrus property in Louisiana called Arlington Apartments (the "Mortgage"), and (2) a guaranty executed by Mondona Rafizadeh, a principal of Cyrus (the "Guaranty"). As per the terms of the Love MLPA, Love Funding assigned the Arlington Loan to UBS and received a fee of $64,000. Both Love Funding and UBS conducted initial due diligence on loans related to the Love MLPA.

On November 1, 1999, UBS and Merrill Lynch Investors, Inc. ("Merrill Lynch") entered into the Merrill Lynch Mortgage Investors Mortgage Loan Purchase Agreement ("MLMI MLPA"), which covered the sale of the Arlington Loan. The MLMI MLPA contained provisions similar to the Love MLPA. Specifically, UBS made several representations and warranties in the MLMI MLPA concerning the Arlington Loan. After purchasing the Arlington Loan from UBS, Merrill Lynch in turn assigned it to the Trust on November 1, 1999 – the date of the MLMI MLPA.

### 2.   2002-2003: Discovery of Cyrus's Fraud and the Foreclosure Action

On March 8, 2002, the Trust notified Cyrus that the Arlington Loan had been declared in default and that the full amount of the loan would be

6

accelerated.[15]  On March 13, 2002, the Court for the Twenty-Fourth Judicial

District for Jefferson Parish ("the Louisiana Court") issued an order to foreclose

on the Arlington Apartments (the "Foreclosure Action").[16]  By March 23, 2002,

the Trust discovered certain facts indicating that Cyrus had committed fraud

during the origination of the Arlington Loan.[17]  Between April and August 2002,

the Trust notified UBS of Cyrus's fraud and demanded that UBS repurchase the

Arlington Loan.  UBS chose to vigorously defend itself rather than cure or

repurchase the loan.

       In September and October 2002, the Trust instituted various lawsuits

against UBS related to the sale of certain loans, including the Arlington Loan (the

---

[15]    Cyrus was current on all principal and interest payments.  The
Arlington Loan, however, was transferred to special servicing by Orix, which
attempted unsuccessfully to inspect the property.  *See* JSUF ¶¶ 40, 42, 49.

[16]    A related action in Texas was eventually consolidated along with this
action in the Louisiana courts.  *See id.* ¶ 55.  I will refer to the two actions
collectively as the "Foreclosure Action."

[17]    The Louisiana Court found in its December 23, 2004 Reasons for
Judgment that Cyrus had in fact committed fraud.  *See Cyrus II P'ship v. ORIX
Capital Mkts., LLC*, No. 578-417, slip op. at 13, 20 (Jefferson Parish Ct. Dec. 23,
2004) (attached to Jan. 11, 2005 Trust Letter in Support of Summary Judgment)
("The evidence of Cyrus's fraud was overwhelming . . . .  But for Cyrus's fraud,
[the Arlington Loan] would not have been made.").  It is undisputed that Love
Funding was unaware of Cyrus's fraud when it originated the Arlington Loan.  *See*
JSUF ¶ 71.

7

"MLMI Litigation"). Between June 7, 2002 and November 8, 2002, Love

Funding received litigation requests related to the Foreclosure Action, and

representatives of Love Funding were deposed. Love Funding was not named as a

party in the MLMI Litigation, but provided third-party discovery.[18] On July 31,

2003, the Trust made a formal written demand on UBS that it uphold its obligation

under the MLMI MLPA to cure breaches relating to the Arlington Loan or else

repurchase. On October 29, 2003, UBS responded in writing to the demand and

declined to cure or repurchase the loans.

> **3.   2004: Settlement of the MLMI Litigation, the Sale of the Arlington Apartments, the Filing of this Action, and the Assignment**

On September 14, 2004, the Trust and UBS settled the MLMI

Litigation ("the MLMI Settlement"). The Trust received 19.375 million dollars

from UBS under the MLMI Settlement.[19] During this time, the Louisiana Court in

the Foreclosure Action determined that Cyrus's fraud constituted an "Event of

---

[18]    UBS impleaded another loan originator, Wexford BancGroup LLC, but chose not to implead Love Funding. *See Trust II*, 499 F. Supp. 2d at 318, n.6.

[19]    As the Trust's sole consideration for releasing UBS from its obligations under the Arlington Loan, UBS assigned to the Trust all of UBS's rights under the Love MLPA. *See* Trial Transcript ("Tr.") at 77, 92 (testimony of John Dinan, a Director of Distressed and Proprietary Assets at Orix).

Default" under the terms of the Mortgage.[20]  Pursuant to court order, on October

21, 2004, Cyrus sold the Arlington Apartments for 6.7 million dollars (the "Sale

Proceeds"), which were then placed in escrow.

Love Funding did not receive a demand to cure its breach or

repurchase the Arlington Loan at any time before November 2004.  On November

1, 2004, the Trust filed the Complaint against Love Funding in this Court.  On

November 3, 2004, the Trust sent Love Funding a formal, written demand that

Love Funding cure its breach of the Love MPLA or repurchase the Arlington

Loan.  Love Funding refused the demand several days later.  On November 15,

2004, the Complaint in this action was served on Love Funding.  On November

18, 2004, UBS assigned its rights under the Love MLPA to the Trust (the

"Assignment").[21]

### 4. 2005-2006: The Trust Receives a Portion of the Sale Proceeds and the Trust Obtains Limited Recovery from Cyrus

On May 5, 2005, the Trust received $5,912,150.78 from the Sale

Proceeds.  On March 31, 2006, the Trust received $4,364.39 from post-judgment

---

[20]    *See Cyrus II P'ship*, No. 578-417, slip op. at 13.

[21]    Although the MLMI Settlement was reached as noted on September 14, 2004, the Assignment was not executed until November 18, 2004.

9

collection efforts against Cyrus.

## III.   APPLICABLE LAW

### A.   Love MLPA[22]

#### 1.   Section 5.02(cc): Representations and Warranties Regarding Individual Mortgage Loans

... [A]s to each Mortgage Loan, [Love Funding] hereby makes the following representations and warranties to [UBS] as of each related Closing Date:

(cc) There is no default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note.

#### 2.   Section 5.03: Remedies for Breach of Representations and Warranties

##### a.   Section 5.03(a) (Notice)

Upon discovery by either [Love Funding] or [UBS] of a breach of any of the foregoing representations and warranties which materially and adversely affects the value of any or all of the Mortgage Loans . . . the party discovering such Breach shall give prompt written notice to the other.

##### b.   Section 5.03(b) (Cure or Repurchase)

Within sixty (60) days of the earlier of either discovery by or notice to [Love Funding] of any Breach of a representation or warranty, [Love Funding] shall cure such

---

[22]      New York law governs the interpretation of the Love MLPA and determines the parties' rights and obligations thereunder. *See* Love MLPA § 9.05.

Breach in all material respects and, if such breach cannot be cured, [Love Funding] shall, at [UBS]'s option, repurchase such Mortgage Loan at the Repurchase Price . . . .

### 3.    Section 1.01:

#### a.    Definitions (Repurchase Price)

With respect to any Mortgage Loan, a price equal to (i) the Stated Principal Balance of the Mortgage Loan, plus (ii) interest on such Stated Principal Balance at the Mortgage Interest Rate from the last date through which interest has been paid and distributed to [UBS] to the date of repurchase, minus (iii) amounts received or advanced in respect of such repurchased Mortgage Loan which are being held in an account maintained by [Love Funding] for the benefit of [UBS] for distribution in the month of repurchase.

### 4.    Section 5.03(d) (Indemnification)

In addition to such repurchase obligation, [Love Funding] shall indemnify [UBS] and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a Breach of [Love Funding] representations and warranties contained in this Agreement or the related Purchase Price and Terms Letter. It is understood and agreed that the obligations of [Love Funding] set forth in this Section 5.03 to cure or repurchase a defective Mortgage Loan and to indemnify the Purchaser as provided in this Section 5.03 constitute the sole remedies of [UBS] respecting a Breach of the foregoing representations and warranties.

11

**B.     The Note**

> [Cyrus] hereby agrees that upon the occurrence of an Event
> of Default or upon the failure of [Cyrus] to pay the Debt in
> full upon the Maturity Date, [Love Funding] shall be
> entitled to receive and [Cyrus] shall pay interest on the
> entire unpaid principal sum at the rate per annum equal to
> the greater of (1) 5% per annum above the Applicable
> Interest Rate or (ii) 5% per annum above the Base Rate
> . . . in effect at the time of the occurrence of default (the
> "Default Rate").[23]

**C.     Mitigation of Damages**

In *APL Co. PTE Ltd. v. Blue Water Shipping U.S. Inc.*, the Second

Circuit recently addressed the issue of mitigation of damages.[24]  "The injured party

. . . bears an obligation to make reasonable efforts to mitigate its damages and

failure to do so may cause a court to lessen the recovery."[25]  Even so, "it is not

required that the injured party actually mitigate its damages."[26]  Provided "plaintiff

---

[23]     Note, Ex. D to Declaration of Alex Farr, Counsel for Love Funding, at 3.

[24]     *See* 592 F.3d 108 (2d Cir. 2010).

[25]     *Id.* at 111 (citing *Losei Realty Corp. v. City of N.Y.*, 254 N.Y. 41, 47 (1930)).  *Accord Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985); *U.S. West Fin. Servs. v. Marine Midland Realty Credit Corp.*, 810 F. Supp. 1393, 1402 (S.D.N.Y. 1993) ("[A]ny award of damages should be reduced by any unnecessary increase in damages due to the failure of the plaintiff to avoid them.") (quotation marks and citation omitted).

[26]     *APL*, 592 F.3d at 111.

12

takes such [mitigating] action within the range of reason, the breaching party remains liable if such reasonable attempts at mitigation fail."[27]

"The standard of what reason requires of the injured party is lower than in other branches of law."[28]  "Any such reasonableness inquiry would begin with the expectations of the parties as revealed by their contract."[29]  A court must assess the steps taken by the non-breaching party to determine the reasonableness of the chosen course of action in light of the surrounding factual context.[30]  In addition, a court must examine the actions of the breaching party when weighing facts in the reasonableness inquiry.[31]  The breaching party is "not entitled simply

----

[27]    *Id.* (citing *Ellerman Lines, Ltd. v. Steamship President Harding*, 288 F.2d 288, 290 (2d Cir. 1961)) (quotation marks omitted).

[28]    *Id.* (citing *Ellerman*, 288 F.2d at 290).

[29]    *Id.*

[30]    *See id.* (noting the insufficiency of the district court's review where the court "failed to assess the missteps it found in [plaintiff's] efforts against the 'the range of reason' standard").

[31]    *See id.* at 112-13. ("In any event, no analysis of [plaintiff's] mitigation efforts, to be judged against the forgiving standard of reasonableness, could be complete without a commensurate analysis of [defendant's] post-breach conduct. Even if the trial court had otherwise properly assessed [plaintiff's] mitigation against the . . . standard of reasonableness, the failure to similarly assess [defendant's] conduct as part of that analysis was error.").

to shift any expenses or costs . . . to [the non-breaching party].  If [the breaching party] had the same opportunity to avoid such costs, it had an obligation to do so."[32]

## IV.   DISCUSSION[33]

### A.   Mitigation

The Trust's claim for damages must be reviewed in light of whether UBS's decision to litigate with the Trust rather than repurchase the Arlington Loan from the Trust was reasonable under the circumstances, as well as whether the actions of Love Funding, the breaching party, were reasonble.  For the following reasons I find – as I indicated in *Trust II*[34] – that UBS failed to mitigate

---

[32]    *Id.* at 112 (citing *Travelers Indem. Co. v. Maho Mach. Tool Co.*, 952 F.2d 26, 31 (2d Cir. 1991).

[33]    The Assignment transferred UBS's rights to damages and indemnification under the Love MLPA to the Trust in November of 2004. Accordingly, it is UBS's actions through November 2004 that I must review in assessing any award of damages to the Trust.

[34]    Though I declined to award damages in *Trust II* due to my finding of champerty, I included the following footnote:

> If I had not found the Assignment to be void, the Trust's damages would be limited to those incurred prior to September 30, 2002.  In *Trust I*, I held that "to the extent that through its own delay [UBS] aggravated its injuries stemming from Love Funding's breach [of warranty] . . . the Trust's recovery should be reduced accordingly."

14

the damages that the Trust, as its assignee, now seeks.  I also find that the Trust's

assertion that Love Funding acted unreasonably is unavailing.

### 1.    UBS Failed to Mitigate Its Damages

That UBS failed to repurchase the Arlington Loan and instead invited

the Trust to sue is central to the analysis of reasonableness.  UBS's choices

differed significantly from a simple decision between settling a claim for a certain

but smaller financial loss and risking a potentially greater loss at trial.  UBS had

> Additionally, I held that UBS "could not accumulate
> default interest by remaining silent" upon learning of Love
> Funding's default. It is undisputed that UBS was on notice
> of Cyrus's fraud by August 2002 and that the MLMI
> Litigation commenced in September 2002.  At that time,
> UBS could have mitigated its damages by either
> repurchasing the loan from the Trust and then demanding
> that Love Funding repurchase it, or impleading Love
> Funding as a third party defendant, as it did with Wexford
> Bancgroup LLC.  In deciding to forego any of these
> remedies and instead to engage in protracted litigation over
> Arlington, UBS failed to mitigate the damages it now
> seeks. Thus, any recovery to the Trust would be limited to
> those [damages] incurred through September 30, 2002,
> which total approximately $1,736,668.35.  This is the
> repurchase price as of September 30, 2002, offset by the
> Trust's recovery from the borrower and proceeds from the
> sale of the Arlington property. It excludes indemnification
> to the Trust for costs incurred pursuing the borrower, as
> these expenses are disputed.

499 F. Supp. 2d at 325, n.79 (citations omitted).

the option to repurchase the Arlington Loan from the Trust following the
discovery of Cyrus's extensive fraud, thereby avoiding any liability to the Trust
and incurring minimal or no fees.  John Dinan, a Director of Distressed and
Proprietary Assets at Orix, testified that a repurchase by UBS would have ended
UBS's liability to the Trust.[35]  In its Reply, the Trust states that "[i]f Love Funding
had informed UBS that it desired to repurchase the loan,[36] it is obvious that UBS
would have accepted this offer – there would be no reason for it to decline, since it
would have absolved UBS from all liability and cost it nothing."[37]

UBS chose instead to engage in costly litigation and the Trust is now
bound by this choice as UBS's assignee.  Seventy lawyers, ten separate law firms,

---

[35]    *See* Dinan Deposition at 204:19-205:6, 251:3-17 (June 7, 2005), Ex.
A to Love Funding Corrected Memorandum Concerning Final Judgment ("Def.
Mem.").  *See also* Tr. at 258:8-19 (Dinan).

[36]    By the terms of the Love MLPA, it was UBS's responsibility – not
Love Funding's – to timely request repurchase of the loan.  *See* Love MLPA,
section 5.03(b) ("if such breach cannot be cured, [Love Funding] shall, *at [UBS's]
option*, repurchase such Mortgage Loan at the Repurchase Price") (emphasis
added).  While I held in *Trust I* that the language of the Love MLPA "does not
make the exercise of this option in a timely manner a condition precedent to Love
Funding's obligation to repurchase the loan," the Trust may not now contort the
terms of the agreement to suggest that it was Love Funding's option to be
exercised.  2005 WL 2582177, at *7.

[37]    Trust Reply Memorandum in Further Support of Its Position on
Damages ("Reply Mem.") at 4.

16

and four courts[38] later, the MLMI ("scorched earth") Litigation was not a choice of

greater or lesser loss. Rather, it was choice between costly and complex litigation

or repurchasing the Arlington Loan and eliminating all of UBS's liability to the

Trust through the eventual repurchase of that loan by Love Funding.

The Trust argues vigorously that Love Funding cannot prove it could

have or would have repurchased the Arlington Loan from UBS and that such

evidence is required to support Love Funding's affirmative defense of failure to

mitigate.[39] The Trust pursues this argument presumably to demonstrate that a

repurchase by UBS without an assurance of repurchase by Love Funding would

have been fruitless, and thus that UBS's choice to litigate was reasonable.

The Trust's argument fails. *First,* UBS never approached Love

Funding with a repurchase demand although Love Funding provided third-party

discovery in the MLMI Litigation and deposition testimony in related actions.

Thus, due to its own inaction, UBS – and the Trust, as its assignee – cannot know

whether Love Funding would have repurchased. *Second,* if Love Funding had

---

[38]     As I noted in *Trust II*, the MLMI Litigation proceeded in one federal
court, two Texas state courts, and New York state court and involved tens of
millions of dollars in legal fees. *See* 499 F. Supp. 2d at 318; JSUF ¶¶ 82-83.

[39]     *See* Trust Memorandum in Support of Its Position on Damages ("Pl.
Mem.") at 10-13.

17

refused the subsequent repurchase, as UBS suggests, UBS could then have argued

that its own course of action in repurchasing was reasonable and that it had

attempted to mitigate its damages. Instead, UBS chose litigation at the outset

without approaching Love Funding and engaging in the first step of repurchasing

the Arlington Loan under the MLMI MLPA.

This decision alone is sufficient to demonstrate a failure by UBS to

take reasonable measures to mitigate its damages. But together with Love

Funding's exclusion from the MLMI Litigation and the Arlington Loan's specific

carve-out from the subsequent MLMI Settlement, UBS's failure to mitigate its

damages is even more egregious. Despite Love Funding's position as the

originator of the loan, UBS neglected to implead or otherwise directly involve

Love Funding in the MLMI Litigation. Moreover, the MLMI Settlement provided

a financial resolution for all loans in the package *except* the Arlington Loan. For

the Arlington Loan only, UBS simply handed over its rights under the Love

MLPA to the Trust – in essence, a ticket to sue – which necessarily entailed

additional fees and costs. These additional actions illuminate the extent of UBS's

failure to take reasonable steps to mitigate its damages.

I therefore find that UBS's decisions – to refuse to repurchase the

Arlington Loan, to engage in litigation with the Trust, to exclude Love Funding

18

from the MLMI Litigation, and to exclude the Arlington Loan from the MLMI

Settlement – were unreasonable and as a result UBS failed to mitigate its damages.

Whether UBS knew that the MLMI Litigation would be long and costly is not the

issue. Rather, UBS chose a course of action certain to incur significant fees while

rejecting the option that would have entirely eliminated its liability to the Trust.

The clarity of hindsight is unnecessary. The reasonable choice was as evident in

2002 as it is now.

### 2.    Love Funding's Actions Were Reasonable

It is undisputed that Love Funding breached the Love MLPA. It is

also undisputed that Love Funding did not provide the prompt written notice

required under the Love MLPA despite its certain knowledge of Cyrus's fraud by

September of 2002. The Trust also asserts that Love Funding did not perform

even the most rudimentary investigation of its potential liability for the Arlington

Loan, an omission the Trust argues is a failure to mitigate.[40]

Love Funding had a limited opportunity to mitigate the damages at

issue. To the extent Love Funding's actions affected the damages now sought, its

choices were reasonable. *First*, although failing to provide prompt written notice

---

[40]    *See id.* at 13.

19

is a mutual breach by both Love Funding and UBS, no damages stem from Love Funding's failure. That Love Funding should have sent prompt written notice is clear; it is also self-evident that sending UBS, a party to the MLMI Litigation, notice of the very fraud on which the suit was based would have been redundant.

    *Second*, Love Funding's decision not to act upon the Trust's initial estimate of liability for the Arlington Loan was reasonable. In *Trust II*, I credited the testimony of Karen Ford, Senior Vice President of Love Funding, who stated that the Trust had initially indicated during a phone call to Love Funding in 2004 that Love Funding would be liable in the amount of ten million dollars for the Arlington Loan.[41]   Ford testified that this was approximately twice the total net value of Love Funding[42] and was, as I noted, an amount that "far exceeded the Trust's own previous calculation of its losses with respect to Arlington (approximately \$3 million), as well as the \$4 or \$5 million the Trust had once been prepared to accept from UBS as compensation for releasing UBS from the Arlington Loan."[43]

---

[41]  *See Trust II*, 499 F. Supp. 2d at 320-21; *see also* Tr. at 464 (Ford).

[42]  *See* Tr. at 464 (Ford).

[43]  *Trust II*, 499 F. Supp. 2d at 320-21 (citations omitted); *see also* Tr. at 90 (Dinan).

20

As I noted in *Trust II*, "[n]o reasonable person, with knowledge of the posture of the loan in November 2004, would have expected Love Funding to pay millions of dollars in interest that had been accruing on the loan for years . . . ."[44] Moreover, given Love Funding's limited ability to mitigate damages and the Trust's excessive initial estimate of liability, Love Funding's actions following the breach were reasonable.[45]

## B. Damages

### 1. Repurchase Price

Under section 5.03(b) of the Love MLPA, Love Funding had the obligation to cure the breach caused by Cyrus's fraud, or, in the event that Love Funding could not cure, to repurchase the Arlington Loan at the Repurchase Price. The Repurchase Price equals the principal plus interest at the non-default rate of

---

[44]     *Id.* at 322.

[45]     The Trust claims that Love Funding had an equal opportunity to mitigate damages. *See* Pl. Mem. at 8-10; *see also APL*, 592 F.3d at 112 ("[A]s the breaching party, [defendant] was not entitled simply to shift any expenses or costs associated with the [breach] to [plaintiff]. If [defendant] had the same opportunity to avoid such costs, it had an obligation to do so.") (citing *Travelers Indem. Co.*, 952 F.2d at 31) ("[T]he victim of a breach of contract need not make expenditures to mitigate damages where the breaching party had the same opportunity to prevent damages.")). Love Funding had no opportunity to prevent the accrual of extensive interest, legal fees, and costs that UBS's refusal to repurchase caused.

21

8.05% from and after February 1, 2002 (non-default interest was paid by the

borrower through this date) plus default interest at 5% per annum from the

inception of the loan on July 7, 1999.[46]

   In *Trust I*, I held that Love Funding was strictly liable for its breach.[47]

Because Love Funding failed to cure or repurchase the Arlington Loan, Love

Funding is liable to the Trust for damages in the amount of the Repurchase Price.[48]

The Trust calculates that as of May 13, 2010, the principal totaled $6,282,671.16,

the interest totaled $4,248,342.24, and the default interest totaled $3,458,959.51

for a Repurchase Price of $13,989,972.91.[49]

   However, interest on the Repurchase Price must be tolled based on

UBS's own actions. As I noted in *Trust II*, UBS may not increase its damages by

---

[46]  *See* Pl. Mem. at 6; *see also* JSUF ¶ 56 (the Louisiana Court determined in the Foreclosure Action that under Louisiana law, default interest commenced on the Arlington Loan on July 7, 1999, the date of the loan origination).

[47]  *See Trust I*, 2005 WL 2582177, at *7.

[48]  Love Funding argues that it did not own the loan in 2002 and therefore could not repurchase it unless it was first repurchased by UBS. *See* Def. Mem. at 11. As noted, Love Funding is strictly liable for the breach. Love Funding is therefore liable for the Repurchase Price in accordance with section 5.03(b) of the Love MLPA.

[49]  *See* Spreadsheet of Damages Calculation, Ex. A to Pl. Mem.

remaining silent after discovery of a breach.[50]  UBS indisputably knew of Cyrus's

fraud by September 2002 when the MLMI Litigation commenced.  Even so, UBS

sent neither the required written notice nor a timely repurchase request to Love

Funding.[51]  Instead, UBS simply continued on with the extensive MLMI

Litigation, never impleading Love Funding while interest and default interest

accrued under the Love MLPA Repurchase Price calculations.  As the

commencement of the MLMI Litigation is incontrovertible evidence of UBS's

awareness of Cyrus's fraud as of September 2002, the interest calculation on the

Repurchase Price must cease after September 30, 2002.

The Trust states that the Repurchase Price as of September 30, 2002

totaled $7,654,056.11, representing $6,282,671.16 in principal, $339,979.77 in

interest at 8.05% per annum, and $1,031,405.18 in default interest at 5% per

annum.[52]  Love Funding is therefore liable to the Trust, as UBS's assignee, for

damages in the amount of $7,654,056.11 representing the Repurchase Price

---

[50]     *See Trust II*, 499 F. Supp. 2d at 325, n.79.

[51]     *See* JSUF ¶ 76 ("Neither UBS nor the Trust made any demand on
Love Funding that it cure or repurchase the Arlington Loan under the Love MLPA
between 2002 and October 2004.").

[52]     *See* Spreadsheet of Damages Calculation through September 30,
2002, Ex. B to Pl. Mem.

through September 30, 2002.

### 2.   Indemnification

Under section 5.03(d) of the Love MLPA, Love Funding must

indemnify the Trust for, inter alia, "any . . . reasonable and necessary legal fees

and related costs . . . resulting from any claim, demand, defense or assertion based

on . . . or resulting from a Breach of [Love Funding] representations and

warranties" in the Love MLPA.  The Trust now seeks indemnification for legal

fees and costs related to (1) the action against Cyrus ("the Borrower Litigation") in

the amount of $2,392,978.89 through the date of trial, (2) a limited portion of

UBS's expenditures (as the Trust's assignor) related to the Arlington Loan in the

MLMI Litigation, stipulated to at trial as $268,231.02,[53] (3) this action through the

end of trial in the amount of $514,415.08,[54] and (4) this action after trial, including

the cost of the appeal to the Second Circuit, in the sum of $1,352,992.55.[55]

Under the "reasonable and necessary" language of section 5.03(d) of

---

[53]     *See* Pl. Mem. at 7; *see also* Spreadsheet of Damages Calculation, Ex.
A to Pl. Mem.

[54]     *See* Pl. Mem. at 6; *see also* Spreadsheet of Damages Calculation, Ex.
A to Pl. Mem.

[55]     *See* Spreadsheet of Damages Calculation, Ex. A to Pl. Mem.

24

the Love MLPA, Love Funding is not liable for any fees and expenses incurred by the Trust. *First*, the millions of dollars the Trust has spent attempting to recover from Cyrus and related parties would not have been incurred had UBS reasonably mitigated its damages and repurchased the Arlington Loan. *Second*, the legal fees and costs UBS expended in the MLMI Litigation – a forum in which Love Funding's involvement could have been addressed had it not been excluded – should not now be placed on Love Funding's shoulders.[56]

      *Third*, Love Funding is not liable for the millions of dollars in legal fees and costs the Trust has expended in pursuing Love Funding. The Trust now stands in UBS's shoes as its assignee and is thus bound by UBS's decisions prior to the Assignment. The fees and costs the Trust claims that it incurred in this action would not exist save for UBS's unreasonable decision to refuse to repurchase. Furthermore, the Arlington Loan was purposely left out of the MLMI Settlement in favor of the Trust obtaining the rights to accrue fees by suing Love Funding in this action. Therefore, the fees and costs incurred in this action are neither reasonable nor necessary under the Love MLPA.

_____

[56]    In *Trust II*, I stated that Love Funding cannot be expected to pay "for expenses UBS incurred as a result of the MLMI Litigation, in which Love Funding was never involved." 499 F. Supp. 2d at 322.

## C.    Credits and Reductions

### 1.    Sale Proceeds

The Trust concedes that Love Funding is entitled to a credit of

$5,916,515.17 representing the funds already received by the Trust from the Sale

Proceeds and from Cyrus.[57]  Love Funding now argues that Orix, "on behalf of the

Trust," holds a perfected first priority lien against 6.9 million dollars in Sale

Proceeds placed in an escrow account.[58]  Based on documents from the Texas

bankruptcy court, Love Funding further asserts that Orix (1) received the entirety

of the Sale Proceeds, (2) voluntarily paid one million dollars of the received Sale

Proceeds to settle administrative and general unsecured claims, and (3) received in

return the right to pursue single-business enterprise ("SBE") litigation and to

receive a distribution of the remaining 5.9 million dollars.[59]

---

[57]    *See* Pl. Mem. at 8; *see also* JSUF ¶¶ 68-69 (the $5,916,515.17 credit includes the stipulated $5,912,150.78 Sale Proceeds and the $4,364.39 sum already recovered from Cyrus).

[58]    Def. Mem. at 21.  The initial amount placed in escrow totaled 6.5 million dollars. *See id.*  At the time of transfer to a separate escrow account held by the bankruptcy trustee, the Sale Proceeds totaled $6,909,986.88. *See id.*; *see also* Notice of Final Transfer of Funds to Trustee and Compliance with Orders, United States Bankruptcy Court for the Southern District of Texas, Houston Division (October 4, 2005) ("Bankruptcy Transfer"), Ex. E to Def. Mem.

[59]    *See* Def. Mem. at 21-23; *see also* Third Amended Settlement Agreement, March 29, 2006, Ex. F to Def. Mem.

The Trust counters that the funds from the Sale Proceeds became the property of the borrower's bankruptcy estate in 2005.[60] The Trust further claims that its attempt to secure a release of all net Sales Proceeds was unsuccessful because the bankruptcy trustee contested the claim and refused to release the entirety of the full Sales Proceeds.[61] The Trust claims that as part of a settlement with the bankruptcy trustee, the Trust received only the previously-stipulated amount of $5,912,150.78.[62]

Love Funding is not entitled to the additional one million dollar credit it now seeks. *First*, Love Funding stipulated to the amount of $5,912,150.78 at trial, presumably after reviewing the information available both publicly and through the production of the Trust. Love Funding may not now, at this post-trial date, "realize" that publicly-available documents might counter the beliefs Love Funding held when it stipulated to the $5,912,150.78 amount. *Second*, Love Funding's contention that the actions of Orix were also those of the Trust are

---

[60]    *See* Pl. Mem. at 22. *See also* Tr. at 144-149 (Dinan); Dinan Deposition, at 12-15 (April 27, 2006), Ex. C to Def. Mem.

[61]    *See* Pl. Mem. at 22; *see also* Tr. at 144-149 (Dinan).

[62]    *See* Pl. Mem. at 22; *see also* June 7, 2010 Affidavit of John Dinan ("Dinan Aff.") ¶ 2.

27

undermined by the Trust's unsuccessful attempt to secure for itself a release of the entire 6.9 million dollars to which Orix was allegedly entitled. The Trust has repeatedly represented that the Bankruptcy Court refused to order a distribution of the entire proceeds to the Trust.[63] As such, Love Funding's credit for the sale of the property remains the $5,912,150.78 stipulated to at trial.[64]

### 2.  Recovery from Cyrus and Rafizadeh (Borrower and Guarantor)

The Trust has already recovered $4,364.39 from Cyrus.[65] Love Funding contends that the Trust "has recovered or stands to recover" millions of dollars more as a result of a March 2009 settlement approved by the Texas bankruptcy court.[66] The March 2009 Bankruptcy Agreement provides that the

---

[63]    See Pl. Mem. at 22; see also Reply Mem. at 10; Bankruptcy Transfer, Ex. E to Def. Mem.; Dinan Aff. ¶ 6; Excerpt of Dinan Deposition, at 17-19 (Apr. 27, 2006), Ex. A to Dinan Aff.; Tr. at 144-145 (Dinan).

[64]    As the Trust was a claimant in the bankruptcy case and was not itself a bankrupt entity, it received no benefit from Orix's application of the one million dollars to pay unsecured creditors of the bankrupt entities.

[65]    See JSUF ¶ 69.

[66]    Def. Mem. at 23; see also Order Approving Motion of Chapter 7 Trustee for Approval of Settlement Agreement in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("March 2009 Bankruptcy Agreement"), Ex. I to Def. Mem.

"Orix Parties' remaining unsecured claim against the Estates shall be allowed in the amount of $8,676,933.46."[67]

Love Funding asserts that any funds recovered from the original debtors — including the proceeds from the March 2009 Bankruptcy Agreement that remain after payment of the bankruptcy estate's expenses — should be subtracted from any award of damages.[68]  I agree.  The damages I award to the Trust represent the total amount that it is owed with respect to the Arlington Loan. Any further recovery would result in a double recovery.[69]  Thus, the $4,364.39 the Trust already recovered from Cyrus and any future distributions from the March 2009 Bankruptcy Agreement or from any borrower must be credited to Love Funding.[70]

---

[67]     March 2009 Bankruptcy Agreement at 3 ¶ 4, Ex. I to Def. Mem.  The term "ORIX Parties" is not defined in the March 2009 Bankruptcy Agreement but the Trust does not contest its inclusion in this term.

[68]     *See* Def. Mem. at 23-24.

[69]     In light of the bankruptcy proceedings, Love Funding requests limited discovery into any additional funds received by the Trust to prevent the Trust from obtaining a "double recovery."  *See id.* at 23.  As the record is sufficient, and as I have addressed this point above, Love Funding's request is denied.

[70]     *See Trust II*, 499 F. Supp. 2d at 325, n.79 (indicating that recovery from the borrower should be credited against any damages recovered by the Trust).  The Trust argues that due to the deceptive conduct of Cyrus and the other debtors, efforts to obtain a recovery have cost the Trust over 2.4 million dollars.

### 3.    Summary

In sum, the Trust is not entitled to indemnification for any costs of

this action, for the Borrower Litigation, or for costs and fees related to the MLMI

Litigation.  The Trust is also not entitled to interest beyond September 30, 2002

that stems from Love Funding's breach.  The Trust is entitled to receive the

Repurchase Price in the amount of $7,654,056.11, reduced by the $5,912,150.78

Sale Proceeds and the $4,364.39 already recovered from Cyrus for a total damage

award of $1,737,540.94.

### D.    MLMI Settlement

The Trust received 19.375 million dollars under the MLMI

Settlement to resolve the MLMI Litigation,[71] but the Arlington Loan was

excluded.  Instead, as to the Arlington Loan, the Trust received only UBS's rights

---

*See* Dinan Aff. ¶ 13; *see also* Reply Mem. at 12.  The Trust claims it has since
spent "many millions of dollars more" in its efforts to seize assets, pursue
litigation, and defend the Trust against counter-suits.  Dinan Aff. ¶ 13.  Dinan
states in his most recent affidavit that the Trust has as yet received no funds from
the March 2009 settlement and that he expects the Trust's expenditures to
outweigh any future distribution from the settlement, resulting in a zero net gain
for the Trust.  *See id.* ¶¶ 15-16.  That the Trust expended more in its efforts to
recover than the likely recovery itself should not preclude Love Funding from
receiving a credit for the amount the Trust receives from Cyrus.

[71]    *See* JSUF ¶ 84.

against Love Funding under the Love MLPA.[72]  In *Trust II*, I held that it was

"simply not credible" that "[i]n calculating the damages it seeks from Love

Funding, the Trust contends that not a penny of its Settlement with UBS should be

allocated to the Arlington Loan."[73]

However, even if UBS had allocated a portion of the MLMI

Settlement to the Arlington Loan, UBS would have paid those funds to the Trust

and thus would have had the right to seek recovery of those funds from Love

Funding under the Love MLPA.  As argued by the Trust, this would now merely

represent an additional category of damages that the Trust, standing in the shoes of

UBS, could seek to recover against Love Funding.[74]  As a result, the amount of

any allocation is essentially irrelevant.  Whatever that allocation might have been,

it would be recoverable from Love Funding.  For that reason, no reduction in the

---

[72]    *See* Tr. at 150:22-152:13 (Dinan).

[73]    499 F. Supp. 2d at 325.

[74]    *See* Reply Mem. at 13; *see also* Tr. at 151:4-13 (Dinan) ("[T]he
[T]rust's position . . . is that it really would be irrelevant, even if you did allocate
some of those funds to Love Funding . . . .  If UBS had . . . or the [T]rust had
agreed to specifically allocate some of the \$20 million to Arlington damages,
those . . . damages would fall under the rights for recovery under the
indemnification of damages under the Love Funding MLPA [resulting in] a net
zero effect to Love Funding.").

31

damages to be paid by Love Funding is warranted as a result of the MLMI

Settlement.   The Trust's damages award remains fixed at $1,737,540.94.

## V.    CONCLUSION

For the reasons stated herein, judgment is entered in favor of the

Trust in the amount of $1,737,540.94.  The Clerk of the Court is directed to close

this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:        New York, New York
              August 13, 2010

32

**- Appearances -**

**For Plaintiff:**

Kenneth S. Yudell, Esq.
ARONAUER, RE & YUDELL LLP
444 Madison Avenue, 17th Floor
New York, New York 10022
(212) 755-6000

Ira M. Feinberg, Esq.
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

**For Defendant:**

Alec W. Farr, Esq.
Howard M. Rogatnick, Esq.
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000